INTERSTATE COMMERCE COMMISSION v. REICHMANN.

(Circuit Court, N. D. Illinois. February 27, 1906.)

No. 27,507.

1. COMMERCE—INTERSTATE REGULATION—POWER OF CONGRESS—TRANSPORTATION CHARGES.

The constitutional power of Congress to regulate commerce among the several states includes the power to regulate freight rates by requiring that they shall be uniform to all shippers, and in construing statutes enacted to that end freight rates should be construed to mean the net cost to the shipper of the transportation of his property, and such regulations may lawfully apply, not only to common carriers, but to all persons and corporations occupying such relation to transportation that the conduct of their business may operate to impair uniformity of rates.

2. SAME—POWERS OF INTERSTATE COMMERCE COMMISSION—PRIVATE CAR COMPANIES.

A private car company which delivers its cars to railroad companies to be furnished indiscriminately for the use of shippers, receiving pay for such use from the railroad companies on a mileage basis, is within the provision of Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], making it unlawful for any person "or corporation to offer, grant, give, or solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any prop-

erty in interstate or foreign commerce by any common carrier * * * whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, or whereby any other advantage is given or discrimination is practiced," and the giving by such a car company of any rebate or allowance to a shipper using its cars, whereby he secures the transportation of his property at a less rate than that named in the published tariff of the carrier for transportation of such property in its own cars, although from its own funds and without the connivance or knowledge of the carrier, is a violation of the statute. Such a car company is therefore subject to the jurisdiction of the Interstate Commerce Commission, charged with the duty of enforcing the statute and having power to inquire into the operations of any agency of transportation which may so conduct its business as to destroy uniformity of rates.

On application by the Interstate Commerce Commission for an order requiring a witness before it to answer a question.

C. B. Morrison, for complainant.
Levy Mayer, for defendant.

LANDIS, District Judge. This controversy involves the power of the Interstate Commerce Commission. That body was in session at Chicago, endeavoring to ascertain how the managers or owners of cars not owned by carriers, but employed by them in the interstate transportation of freight, conducted their business. The respondent was on the stand as a witness, and having testified that he was vice president of Street's Western Stable Car Line, an Illinois corporation owning some 9,000 cars, in general use for the transportation of live stock over the lines of the various railroads on this continent, was asked the following question: "What part of the mileage, or from whatever source, have you given up to shippers during the last six months?" On the advice of counsel, the witness refused to answer, on the ground, as alleged, that the Commission was without authority to exact from him the information called for, and the Commission petitioned the court for an order requiring the witness to answer. It appears that the Street Company's cars are not let to railway companies under regular lease, but that they pass indiscriminately over all lines, participating in the live stock transportation business to such extent as may be dictated by the carrier's necessity or policy, in the discharge of its obligation to supply shippers with cars; that the car company's only revenue for the use of its cars is six-tenths of a cent for each mile run, paid by the railway company on whose rails the mileage has been earned. The car company has no direct or open relations with the intending shipper. It does not undertake to supply him with cars. This is done by the carrier, and when the shipper is furnished cars belonging to the Street Company, he gets no other or better transportation service than when his cattle go forward in cars of the carrier railway company. Nominally, at least, the car company's only relation respecting freight to be shipped is with the carrier, and its only interest in the transaction is that the freight may go forward in its cars; and this, because when the car stands idle it produces no revenue for its owner, and when it is in motion it is

earning mileage. It will therefore be observed that the best business policy of the car company is that which produces a maximum of activity on the part of its cars.

In considering the question, I shall assume, as counsel did at the argument, that an answer by the witness would have disclosed that payments of money were made by the Street Company to shippers of freight, and with a view to thereby inducing such shippers to demand that carriers furnish them with Street's cars for the transportation of their future shipments. And I shall further assume, as the proof indicates, that these payments were made by the car company solely on its own initiative and responsibility—disassociated, completely, from any connivance on the part of the carrier railway company to which the shipper delivered the traffic, in the first instance, for transportation. For if such payment should come from the carrier to the shipper, the Street Company being used by the parties merely as an agency of payment, it would be a rebate, and therefore a plain violation of law. It was maintained for respondent that the witness should be excused from answering the question on the theory that existing statutes of the United States are operative on common carriers and not on private car companies, and (having particular reference to the so-called "Elkins Act" of February 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), that Congress is without power to prohibit the payment of money by private car companies to shippers of freight; in other words, that the Commission is without authority to inquire into such a corporation's affairs. When the words "commerce" and "transportation" are used herein, they are to be understood as relating to interstate "commerce" and "transportation."

The purpose of the enactment of the statutes relating to interstate commerce was to give to all shippers of property uniform treatment in the matter of transportation, and the Interstate Commerce Commission was created to secure the enforcement of those statutes. In the discharge of this duty, the Commission is authorized to procure information from any person whatsoever tending to show whether those laws are being obeyed. The question then presented is, would the payment, by the private car company, of a sum of money to a shipper who had previously paid the railway company the regular rate, place such shipper in a more favorable position respecting the question of transportation than that prescribed by the published tariff and occupied by shippers generally, and if so, has Congress prohibited a private car company from making such payment, and is such prohibition authorized by the federal Constitution. That the person to whom the payment is made has been, thereby, removed from the level of equality, to establish which the laws were passed, is too plain to justify extended consideration. With respect to the transportation of his property, he is just as much better off than the general run of shippers as the payment amounts to. The net cost of the transaction to him—his freight expense—has been reduced just that much. It, therefore, being apparent that in such a case the purpose of the legislation has been defeated, the inquiry is, "has this defeat resulted from the violation of a valid statute of the United States?"

And first, of the power of Congress. The language of the commerce clause of the Constitution is: "The Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." It will be observed that this grant is without qualification or restriction; that it is all the power over the subject that the people had; that, therefore, there now abides in Congress sovereign authority over interstate commerce; that is to say, all the authority over the subject that inheres in government. The real question, therefore, presented, is not merely whether Congress has authority to regulate private car companies, but, rather, "is the power to require a uniform freight rate an attribute of sovereignty?" I am not aware that the general principle that this authority does exist is now seriously antagonized. One result of the enactment of the original Interstate Commerce law, and of the controversy that has arisen under it, is the practically universal acquiescence in this proposition. But the application of the principle to the case at bar is disputed. Let us, therefore, have an understanding of what is meant by "freight rate." It cannot be denied that there is very respectable authority in support of the contention that a rate is the sum of money which the carrier receives from the shipper when he delivers his property for transportation. But is this the real—the only meaning of the term? If the carrier should subsequently pay to the shipper a portion of the sum so received, would not the net amount the shipper paid be the rate? Or, if some other interest commercially concerned in that particular transaction of transportation, as for example, a car company, should pay a sum of money to the shipper on account, or in consideration, of the transaction, would not the net result shown by subtracting the amount thus received by the shipper from the sum originally paid by him to the carrier be the rate? And in such a case, would not the car company, instead of the carrier railway company, make the real rate? Is not the answer to this inquiry necessarily in the affirmative?

Bearing in mind the quasi public character of the service for the performance of which the shipper pays the money, involving, as it does, the exercise of franchise powers granted by the nation or the state, or by both, I shall consider, in dealing with this question, that the rate with which constitutions and statutes are concerned is the net cost to the shipper of the transportation of his property. The frailty of the contention that Congress may legislate only respecting carriers is chargeable to the unsound premise that the authority reposed in Congress is merely to regulate one class of corporations engaged in commerce, whereas the grant is of the power to regulate the thing itself, by whomsoever carried on or participated in. Having, therefore, plenary power to regulate interstate commerce, and uniformity being of the very essence of regulation, the true rule must be that as a logical and necessary incident of the power to regulate, Congress may prohibt the doing, by any person whatsoever, of any act or thing, the purpose or effect of which is to prevent or disturb uniformity. And this power of prohibtion is as broad as the subject of the regulation. It embraces not only carriers, but it extends to

and includes all persons and corporations occupying such a relation to transportation as that the conduct of their business may operate to effect an impairing influence on uniformity. All agencies and instrumentalities of transportation, by virtue of their employment as such, from the beginning of the first act of "taking up property at one place" to the end of the last act of "setting it down at another place," are as completely subject to this sovereign dominion as is the carrier.

The question then arises, "has Congress exercised this power by enacting a law applicable to the pending controversy?" Down to the year 1887, the rules of the common law controlled this subject. Under those rules, a carrier was required to transport property for what was called "reasonable compensation," but judges did not agree that the carrier was obliged to treat all shippers alike. The attitude of both shipper and carrier was therefore dictated by business expediency; the former seeking the service at the least possible cost to himself, and the latter making such rates, and conceding such advantages, as seemed calculated, or appeared necessary, to invite traffic, the full liberty of neither being regarded, as in any substantial way, embarrassed by the law of the land. The result of this unrestrained freedom of action was that large volumes of traffic originating in a common source received preferential treatment by carriers, and it was for the purpose of putting a stop to this practice that the original interstate commerce act was passed. That law sought to establish a condition of absolute uniformity throughout the domain of interstate transportation, to the end that no man having freight to ship would be charged more than anybody else had to pay. That this law failed to accomplish the object of its enactment was due, primarily, to the fact that its prohibitions were aimed at and operated only on carriers. Its provisions did not extend to and embrace persons and corporations interested in or concerned with the transportation business other than carriers, and their agents and shippers remained at full liberty to exact from railway companies transportation service at lower rates than were accorded patrons generally. If lower rates were given, the carrier, only, was guilty of an offense. The principal effect of the law seems to have been to require the resort to roundabout methods for the purpose of evading uniformity. The records of the proceedings of the courts and of the Interstate Commerce Commission, during the years succeeding 1887, disclose the employment of a large variety of means to evade the law. One of these was the use of the so-called private car; that is, a car which did not belong to the railway company, but did belong either to the shipper himself or to a corporation which was neither carrier nor shipper, it being generally understood that in the case of the shipper whose traffic went forward in his own car, excessive payments were made to him on the alleged score of mileage, which, in effect, brought his transportation cost below the regular rates, and in the case of the shipper whose goods were vehicled in cars belonging to a car company, payments of money, as commissions or otherwise, were made to him by or through the medium of such private car company; the effect of which was to give him the service at a cost below the regular tariff.

These various evasions had developed to such an extent that at the session of 1902–03, Congress set about to devise a plan to put a stop, · once for all, to transportation favors. The previous endeavor to accomplish this by penalizing acts of favoritism committed by carriers and their agents having proved abortive, and the experience of 15 years under the original act having demonstrated that if shippers of property were to be placed on an absolute level of equality, additional prohibitory legislation extending to shippers and to persons and corporations beyond, or behind, the railway company, was necessary, the law of 1903 was enacted.

Section 1 of that act provides, first, that anything done or omitted by any agent of a carrier corporation in violation of the law relating to interstate commerce, shall also be held to be a like violation on the part of the carrier. This section then enacts that the willful failure of the carrier to publish its tariffs or rates for the transportation of property shall constitute a misdemeanor. The enactment then proceeds as follows:

"And it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive, any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier * * * whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, or whereby any other advantage is given or discrimination is practiced."

The offering, granting, or giving, or soliciting, accepting, or receiving, any such rebate, concession, or discrimination, is declared to be a misdemeanor punishable with a fine. While this enactment, in terms, prohibits any person, persons, or corporation, from giving any concession or discrimination in respect of the transportation of property by a common carrier, the respondent contends that the only effect of the clause quoted is to prohibit the shipper from soliciting or accepting preferential treatment from the carrier, and the carrier and its agents from offering or giving it. This contention means that, whereas, the universally conceded purpose of the law relating to interstate commerce is to put all shippers on an equality, the shipper is still perfectly free to accept money from any other source than the carrier itself, and that any person or corporation other than the carrier is at liberty to make such payment. It is not and cannot be denied that the effect of such a transaction would be to absolutely disrupt uniformity. Indeed, the very purpose of the payment by the car company is to place the shipper in a position of preference, and thereby to induce him to require the carrier to furnish Street's cars for his future shipments, on which, presumably, he would receive like payments from the car company, thus securing to him a continuing financial advantage not contemplated by the regular tariff. Does the language bear this construction? Is it the deliberately expressed intention of Congress, in this legislation enacted to preserve the integrity of the published rate, that the rate may be varied by some intervening or coöperating or subserving agency, or is it the expressed intention that nobody may do what a carrier is forbidden to do? Let it be remembered that the carrier and its agents had already been required

to adhere to the regular published rate, it having been specifically enacted, at the beginning of section 1, that any offense committed by the carrier's agent, as provided by the original act, should be held to be a like offense committed by the carrier corporation. Do the words, "it shall be unlawful for any person, persons, or corporation to offer, grant, or give * * * any rebate, concession, or discrimination * * *" prohibit a private car company from paying money to a shipper "in respect of the transportation of his property" by a common carrier in cars belonging to the car company? Such payment is not merely "in respect of such transportation," but it is in consideration of such transportation. And that it would be a concession or discrimination which would operate to give the fortunate payee an advantage, by reducing his freight account below the regular rate, is obvious. John Jones, cattle shipper at Omaha, calls on the Denver & Chicago Railroad Company for 10 cars for Chicago shipment. The railway company gives Jones cars belonging to the Street Company. Jones pays the railway line the regular rate. The cattle go forward in Street's cars, and at the end of the month the railway company sends to the Street Company a check covering mileage earned by the cars. Thereupon, the Street Company pays out of its own revenue, to Jones, $10. Jones takes the $10 and credits his freight account accordingly. The net result is that Jones is $10 better off than he would have been had the shipment been handled in cars belonging to the railway company; that the cost to him of the transportation of his cattle has been reduced $10 below the regular rate, to which extent he has enjoyed a concession or discrimination which has given him an advantage over his competitor, Smith, whose request for cars, made at the same time that Jones made his, was complied with by the railway company furnishing its own cars, it being assumed, of course, that the carrier received from Smith, as it did from Jones, the published rate, and did not subsequently give him any rebate.

It is conceded that if the Street Company had paid the money at the instance of the railway company, the Street Company and the railway company would each be guilty of a misdemeanor, but guilty not merely because money was paid to a shipper, but solely, because when it paid the money the Street Company was acting as the representative of the railway company. The contention of respondent is, however, that although the car company is prohibited from thus acting in behalf of the railway company, it is not unlawful for the car company to give the shipper the money from its own treasury, and this means that the shipper (whose preferential treatment in the matter of transportation, the law was enacted to prevent) may, with equal propriety, accept the money from the car company, being only careful to ascertain in advance that in making the payment the car company is using its own funds, and is not acting in a representative capacity for the carrier corporation. The logic of this position is that in any prosecution of a carrier railway company, or private car company, or shipper, for violating the law by departing, or causing a departure, from the published rate, it would be a complete exoneration of either one or all of these parties for the car company to simply admit that

although it gave the money to the shipper, the funds came out of its own treasury. That this is not what Congress endeavored to enact is evidenced by section 2 (32 Stat. 848 [U. S. Comp. St. Supp. 1905, p. 600]), which is as follows:

"That in any proceeding for the enforcement of the provisions of the statutes relating to interstate commerce, whether such proceedings be instituted before the Interstate Commerc Commission or be begun originally in any circuit court of the United States, it shall be lawful to include as parties, in addition to the carrier, all persons interested in or affected by the rate, regulation, or practice under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers."

I am of the opinion that the law prohibits the car company from giving to any shipper of property a favor or advantage not publicly offered to all shippers by the published tariffs issued by the carrier, and therefore that a reply to the question, which the witness refused to answer, would give the Commission information respecting a matter as to which it is charged with the performance of a duty.

Let an order be entered in accordance with the prayer of the petition.