## EL DORADO TERMINAL CO. v. GENERAL AMERICAN TANK CAR CORPORATION.

No. 8799.

Circuit Court of Appeals, Ninth Circuit.
March 17, 1939.

Rehearing Denied May 19, 1939.

W. F. Williamson, Richard P. Norton, and W. R. Wallace, Jr., all of San Francisco, Cal. (Williamson & Wallace, of San Francisco, Cal., of counsel), for appellant.

Allan P. Matthew, John O. Moran, F. W. Mielke, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for appellee.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment denying to appellant, plaintiff below, recovery of moneys collected by the appellee, defendant below, as agent for appellant, from several interstate railways.

The case is at law, the jury was waived and the court based its judgment against appellant El Dorado Terminal Company, hereinafter referred to as the El Dorado Company on special findings and its conclusions of law.

The El Dorado Oil Works, a corporation owning and operating a vegetable oil refining plant at Berkeley, California, entered into a leasing contract with the appellee General American Tank Car Cor-

poration, hereinafter referred to as the Car Corporation. The Car Corporation leased to the El Dorado Oil Works for three years, from January 1, 1934, 50 specialized coiled tank cars for the carriage of the Oil Works' vegetable oil. The rental for the cars was payable monthly. In the neighborhood of 99 percent of the Oil Works' product is so carried over one or another of three transcontinental railways, into interstate commerce from its Berkeley plant.

The lease was assigned by the Oil Works to the appellant El Dorado Company, the former's wholly owned subsidiary, which brought this suit.

The suit concerns the claimed obligation of the Car Corporation under the car leasing contract to pay over to the El Dorado Company moneys the Car Corporation, the El Dorado's collecting agent, collected from the railways. The moneys were paid by the railways pursuant to a mileage tariff rate, duly filed with the Interstate Commerce Commission, as compensation for supplying them with the specialized coiled tank cars for the carriage by them of the Oil Works' and appellant's vegetable oil. The carriers were not equipped with such cars and the supplying of them by the shipper for the tariff rate had been a practice recognized by the Interstate Commerce Commission for over a quarter of a century.

There is no question concerning the right of the El Dorado Company to sue for breach of the assigned contract and to recover if its view prevail as to the law and facts relative to the collection and payment of the tariff rates.

Under the terms of the contract the Car Corporation was to collect from the several interstate carriers serving the El Dorado Company the 1½ cents per car mile of the filed tariff rate for supplying to them the tank cars and credit the collections to the El Dorado Company. For 5 months after January 1, 1934, the beginning of the term, the Car Corporation performed this collecting agency contract crediting the El Dorado Company with the collections and making monthly payment to the El Dorado Company of the balance thereof, after deducting the monthly rental of the car lease and certain repair charges.

After July 1, 1934, the Car Corporation declined to pay over any balance to the El Dorado Company. It continued to collect in full from the carriers the tariff mileage, but claimed that all the balance over its monthly rentals and charges, it could keep to its own use. It based its refusal on three contentions:

(1) That the Car Corporation and not the El Dorado Company was the supplier of the cars to the railways; (2) that the monthly rental charge constituted the sole cost to the El Dorado Company in supplying the cars to the railways; and (3) that any amount paid by the railways to the shipper supplying them cars to carry its own oil, above this claimed actual cost to the supplier, reduced the shipper's *transportation cost* under the *freight* tariffs and, hence, that the payment by the Car Corporation to the El Dorado Company of the excess of car mileage tariff collections over rentals would constitute a rebate under the Elkins Act.[1] We hold that the

---

[1] Section One. " * * * [It] shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to * * * [the Interstate Commerce Act] whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by * * * [the Interstate Commerce Act], or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or

discrimination shall be deemed guilty of a misdemeanor * * *.

" * * * Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the Act to regulate commerce or Acts amendatory thereof [the preceding chapter], or participates in any rates so filed or published, that rate as against such carrier, its officers or agents, in any prosecution begun under this Act [sections 41, 42 or 43], shall be conclusively deemed to be the legal rate, and *any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this* section of this Act." (Emphasis supplied.)

32 Stats. 847, 848; 34 Stats. 587, 588; 49 U.S.C.A. § 41 (1) and (2).

Car Corporation has sustained none of these contentions. The case is of novel impression and because of this and of a dictum of the Interstate Commerce Commission, we have given it extended consideration.

■ (1) *The lease deprived the Car Corporation of the possession and control of the 50 cars for the three year term and the Car Corporation could not supply them to the railways.* This is, apparent from the terms of the lease. It required the El Dorado Company to take the cars into its possession and pay the rental for the full three year term whether or not they were used. The purpose of the lease is clear. It is to give to the El Dorado Company a supply of cars·devoted solely to meeting its own business requirements. They thus became instantly available for the delivery of its oil to its customers on one or another of the three railways' lines or their connecting carriers. They could be distributed for the service of its future orders.

The Car Corporation had no choice in the railway to be served by any of the cars nor, if they were not used by the El Dorado Company, could the Car Corporation require them to be supplied to any railway for the service of any other shipper. There is no basis for the Car Corporation's claim that it can retain the excess of the mileage collections over rentals because it and not the El Dorado Company supplied the cars to the three railways.

■ (2) *The monthly rentals did not establish the cost of the El Dorado Company in supplying the cars to the carriers, and the Car Corporation has not proved that that cost is less than the mileage earnings of the cars.*

The Car Corporation assumes in its pleading of its affirmative defense that it would be a rebate to pay over to the El Dorado Company any balance above the car rentals and repair charges, and hence a crime which permits it to retain such balance; and the court assumes in its decision sustaining the claimed defense, that the monthly rentals constituted the total cost of the El Dorado Company in supplying the cars to the carriers.

The Car Corporation has not established that the cost of supplying the cars is less than the mileage earnings. The lease pleaded in the defense not only shows the contrary likelihood but that the rental cost itself is not determined by the month-

ly payments of $27.50 for each car. In addition to the monthly rentals, the lease provided for a possible further rental to be paid the Car Corporation at the end of the three years. This additional amount was the excess·of tariff rates collected by the Car Corporation from the carriers for the mileage of the empty cars over the mileage for the loaded cars while carrying the El Dorado Company's oil. The El Dorado's cost can be determined only by considering this future added rental.

In determining what constitutes a supplier's cost, the Interstate Commerce Commission has considered its experience with the supplied facilities for a period as long as 18 years. Mileage Allowances on Refrigerator Cars, 218 I. C. C. 359, and cases cited infra. With such a lease it would require a consideration of the El Dorado Company's rationally expected three year supply experience with the cars to ascertain its cost of supplying them to the railways, before it could be determined whether the supplying was profitable. This·cost calculation would involve much more than the per car monthly rentals .plus the additional rental at the end of the three years.

Since the El Dorado Company has possession of the cars, it must provide trackage facilities for their storage and switching. It has the current cost of their administration. It has the cost of cleaning the cars, not a simple task when it is considered that any rust or foreign substance on the coils which wind through the oil or on the sides of the cars may spoil the sensitive vegetable product.

During the three years there exist possible liabilities under the lease which easily could wipe out any excess of mileage over rentals. The El Dorado Company must pay the Car Corporation for any damage or destruction to the cars while on its own or its customers' private tracks. The oil is both inflammable and explosive and the contents may destroy the cars; so also may a conflagration or a collision or other happenings on the private tracks. So also the lease places on the El Dorado Company the liability for injury to persons or property caused by the use of the cars. It is a matter of business judgment whether to insure against such risks, if insurance be obtainable.

Also before it can be determined whether the three year lease will create a cost less than the mileage earned by the leased cars, it must be considered whether the

plant will remain in operation. The monthly rentals go on though a fire or earthquake or a strike makes it impossible to manufacture the oil for shipment in the cars. The supply of copra from the Philippines may cease or become so costly that it does not pay to operate. Tariffs on copra may stop profitable manufacture. The rental costs for supplying the cars for 18 months may be the total 36 month obligation under the lease.

The Car Corporation has not sustained its burden of proof that the payment of the balances of mileage collections would be more than the added cost and liabilities we have described and the judgment may be reversed on this ground alone. Whether under the new district court rules the complaint could be amended and a new trial had, we leave to the lower court, if the Supreme Court should not agree with our decision on the Car Corporation's third contention, which otherwise disposes of the case.

(3) *The Elkins Act makes it a criminal offense for the railways to pay less than their established mileage rates for the cars supplied by the El Dorado Company. The mileage rates properly are based upon averages which assume that certain shippers-suppliers having lower costs will make a profit. Such profit does not constitute a rebate prohibited by the Act.*

The Elkins Act was passed in 1903. Three years later, in 1906, Congress recognized that despite the command of the Interstate Commerce Act of 1887, the railways were not supplying to specialized industries such facilities as these coiled tank cars. In a statute increasing the penalties of the Elkins Act from a fine to from $1,000 to $20,000, to the fine plus, at the option of the sentencing judge, imprisonment for not more than two years,[2] Congress also specifically provided for the right of owners shipping goods interstate to supply their carriers with the facilities necessary to the transportation of their products.[3] That provision of 1906 was added to § 15 of the Interstate Commerce Act of 1887. It was later amended in a manner not relevant and the language recognizing this shipper-supplier right now reads:

"§ 15, par. (13) *Allowance for service or facilities furnished by shipper.* If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the used [use] of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for under this section." 49 U.S.C.A. Chap. 1, § 15, par. (13).

The "just and reasonable" "charge and allowance" for providing carriers such instrumentalities as coal cars, log cars (bents), refrigerator cars, tank cars and the like, are required by the first paragraph of § 6 of the Interstate Commerce Act, as amended in 1906, to be fixed and stated in their filed and published tariffs. The provision reads:

"§ 6, par. (1) *Schedule of rates, fares, and charges; filing and posting.* Every common carrier subject to the provisions of this chapter shall file with the commission created by this chapter and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. * * * The schedules printed as aforesaid * * * shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be

---

[2] 34 Stats. at Large, 584, 588.

[3] 34 Stats. at Large, 590.

accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, *transportation, and facilities* defined in this chapter." (Emphasis supplied.) 49 U.S.C.A. Chap. 1, § 6, par. (1).

The word "transportation" for which this section requires the filing of rate schedules is defined in paragraph (3) of § 1 (49 U.S.C.A. § 1(3)) as including "locomotives, *cars,* and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, *irrespective of ownership or of any contract, express or implied, for the use thereof,* and all *services* in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." (Emphasis supplied.)

■ Hence, the "allowance" for the "service" of furnishing to carriers "transportation", i. e., tank cars, "irrespective of ownership or of any contract, express or implied, for the use thereof", which, under § 15, par. (13) a shipper-supplier was permitted to render, is to be determined by "rates" which are to be "stated separately" in the schedules to be filed with the Commission and published by the carrier.

■ Uniformity of charges for carriers' services was one of the main objectives of the three regulatory acts. The evils of discrimination of one shipper over another had become so great that establishment and publication of uniform tariffs requiring the same charges to all for carriers' services is one of the primary requirements of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.

The Elkins Act in 1903 reinforced this compulsion for uniformity by making it a crime for a carrier to deviate from its tariff schedules, and the Hepburn Act increased the penalty to a possible two years' imprisonment. The provision is: "* * * Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the Act to regulate commerce or Acts amendatory thereto [the preceding chapter], or participates in any rates so filed or published, that rate as against such carrier, its officers or agents, in any prosecution begun under this Act [sections 41, 42 or 43], shall be conclusively deemed to be the legal rate, *and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of this Act."* (Emphasis supplied.) 32 Stats. 847, 848; 34 Stats. 588; 49 U.S.C.A. § 41(2).

Section 15 of the Interstate Commerce Act so recognizing the shipper's right to supply "instrumentalities" to his carrier, provided for a hearing by the Commission on complaint or its own motion to determine whether the rates for rendering any service or furnishing any instrumentality are "just and reasonable", with the power in the Commission to fix a "reasonable" "maximum" charge. 49 U.S.C.A. § 15, (13). When this reasonable maximum is fixed, the carriers file and publish in their schedules a rate of compensation, not more than the reasonable maximum fixed by the Commission.

■ It is obvious that this compensation by uniform rates to the shipper for supplying services to the carriers in aid of transportation of its own goods would in many cases yield a profit to certain shippers. Uniformity of rate is determined by the Commission, often by a computation of the average of the costs of many suppliers over a prior period of several years. U. S. Cast Iron Pipe & Foundry Co. v. Director General, 57 I.C.C. 677, 685; Mileage Allowances on Refrigerator Cars, 218 I.C.C. 359.

However, such individual economic advantage is inevitable if the Congressional intent of uniformity of charge by fixed rates, applicable to all suppliers, is to be attained. The Supreme Court, in an opinion by Mr. Justice Holmes, in reviewing cases in which the rate for supplying grain elevator facilities to the interstate carriers was reduced from $1\frac{1}{2}$ cents per 100 pounds to $\frac{3}{4}$ of a cent, stated: "The law does not attempt to equalize fortune, opportunities, or abilities". Interstate Commerce Comm. v. Diffenbaugh, 222 U.S. 42, 46, 32 S.Ct. 22, 24, 56 L.Ed. 83. See, also, same case below, F. H. Peavey & Co. v. Union Pac. Ry. Co., 8 Cir., 176 F. 409, 419, 420.

If the Car Corporation's contention were the law, instead of the required uniformity to all competing industries depending on and using interstate railways, every shipper-car-supplier would have to establish to his carrier for *every car* supplied, the exact cost to him before the carrier could pay him his compensation. Since, if the railway pay more, it is liable to at least a $1,000 fine for its payment

for each car or cars so used, with a maximum of a two year sentence, we may be sure the many thousands of annual negotiations between shippers and carriers would be most vigorously conducted. The wastage of time and economic effort would be enormous.

Apart from wastage of. effort, it would greatly increase the opportunity for rebating and discrimination. The competitive carriers would be pressed to come to the standard of the "most liberal estimator" of the supplier's cost. In these great industries requiring specialized types of cars, rebating would tend to become universal. Unless the carriers are compelled to supply such specialized tank cars and the shippers are allowed to supply them only in exceptional instances, it is not conceivable that Congress intended the Interstate Commerce Act and Elkins Act should be interpreted as contended by the Car Corporation.

The practice of furnishing private cars by shippers to their carriers after the Interstate Commerce Act was amended in 1906, was recognized in 1910 by the Interstate Commerce Commission in a decision involving the supplying of tank cars. The tariff rate shown then to have been established was ¾ cent per car mile. Procter & Gamble Co. v. Cincinnati, H. & D. Ry. Co. et al., 19 I.C.C. 556, 557, 560.

In 1917 Congress enacted more specific provisions controlling the practice. 40 Stat. 101. This legislation, amended in 1920, in respects not relevant, (41 Stat. 476, 477), adds to Section 1 of the Interstate Commerce Act 49 U.S.C.A. § 1, the following paragraphs:

"(10) The term 'car service' in this Act [chapter] shall include the use * * * of locomotives, *cars,* and other vehicles used in the transportation of property, including special types of equipment, * * by any carrier by railroad subject to this Act [chapter].

"(11) It shall be the duty of every carrier by railroad subject to this Act [chapter] * * * to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.

\* \* \* \* \* \*

"(13) The [interstate commerce] commission is hereby authorized by general or special orders to require all carriers by railroad subject to this Act [chapter], or any of them, to file with it from time to time their rules and regulations with respect to car service, and the commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this Act [chapter] relating thereto.

"(14) The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this Act [chapter], *including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it,* and the penalties or other sanctions for nonobservance of such rules, regulations or practices." (Emphasis supplied.)

In 1918, the Commission conducted a hearing under the provisions of the 1917 statute to determine, among other things, whether the then published tariffs for the supplying of tank cars should be increased.

The hearing involved a review of the whole question of the supplying of cars to carriers by shippers and the Commission found that the practice, then some 20 years old, drew its supply of cars from some 200,000 not owned by the railways. It decided that such supply by the shippers was advantageous to the movement of interstate commerce and that the method of compensating the shipper was by a uniform rate to be published in the carriers' tariffs, and ordered a continuance of the long established practice to file and publish such rates. It decided that the rates should be computed on the basis of mileage traveled by the shipper's car, both in the carriage of his goods and in the return of the empty cars. It made no provision for any deviation from the uniformity of this rate.

In the particular case of the claim of the shippers supplying leased cars, it held that they "may continue to lease cars to transport their shipments from sources independent of carriers by railroad". With regard to tank cars it held that the then mileage rate in the published tariffs, payable to the shipper, should be increased.

Pertinent portions of the Commission's decision are:

"When a shipper furnishes his own car for transportation of articles in common use and which move in large volume, he relieves the carrier of so much of its obligations as a common carrier. This is true whether the shipper furnishes the car as owner *or lessee.* Carriers recognize this and make allowances to the owner or controlling shipper, as before stated, for the use of such cars. The question here to be considered is as to *the basis* of the allowance or payment therefor. \* \* \*

"The act of May 29, 1917, hereinbefore referred to, grants power to the Commission to fix the compensation to be paid for the use of any car not owned by the carrier.

\* \* \* \* \* \*

"Under all the facts and circumstances shown of record, we [the Commission] find:

"1. That as the situation now exists, and under the circumstances and conditions shown of record, shippers may continue to lease cars to transport their shipments from sources independent of carriers by railroad.

\* \* \* \* \* \*

"3. That payments should be made by carriers on the basis of the loaded and empty mileage, and that mileage should be computed on the basis of distance tables without the elimination of mileage through switching districts.

\* \* \* \* \* \*

"5. That the present payment of ¾ cent on the loaded and empty movements for the use of tank cars of all kinds by all carriers by railroad should be increased to 1 cent per mile for the loaded and empty movements; \* \* \*". (Emphasis supplied.) In the Matter of Private Cars, 50 I.C.C. 652, 680, 681, 709.

Here again it must have been obvious to the Commission that there would be many shippers who would be able to supply tank cars at less than the rate based upon the averages for all. Nevertheless, the Commission held "If private cars are used, they must be under an arrangement stated definitely in tariffs". Id., 677.

It did so, recognizing that shippers leasing cars would have different rentals, one from another, and hence that the rental may be profitably less than the tariff. The Commission states this with reference to tank cars for the transportation of cottonseed oil: "Tank cars for transportation of cottonseed oil or other seasonable articles are, in the main, used by the owners to transport their own traffic, but they lease them at times when not in their own service for any price they can secure, which, of course, varies with different seasons and the needs of the lessees." Id., 676.

And generally of all cars supplied by shippers: "The allowance that shall be paid for the use of private cars under all the circumstances and conditions shown must be considered on *the average. There can not be, with propriety, as many different rates of payment as there are owners with varying ability to efficiently handle the cars with respect to mileage earnings, repairs, and depreciation, nor can there be as many rates as there are different kinds and grades of privately owned cars.*" (Emphasis supplied.) Id., 683.

Once this average scheduled rate is established, a violation of its uniformity by paying a shipper-supplier of cars a less amount becomes a crime under paragraph (2) § 1 of the Elkins Act.

Such averages have determined tank car supplying rates in subsequent cases. See Switching Rates in Chicago Switching District, 1931, 177 I.C.C. 669, 704 et seq.; Mileage Allowances on Refrigerator Cars, 1936, 218 I.C.C. 359, 364, 365.

The Supreme Court recognizes the right to make such rate on a particular service by averaging on the experience of others rendering a similar service, and that its determination is primarily a matter for the Commission. O'Keefe v. U. S., 240 U.S. 294, 302, 303, 36 S.Ct. 313, 60 L.Ed. 651. Cf. Sprunt & Son v. U. S., 281 U.S. 249, 259, 50 S.Ct. 315, 74 L.Ed. 832, where a "level" rate was fixed by the Commission for all carriers.

Since the decision of In the Matter of Private Cars, supra, the Commission has raised the tariff rate on tank cars to 1½ cents per car mile traveled, both loaded and empty, and as noted, the Car Corporation's answer admits that the schedules of the three carriers to which the El Dorado Company supplied the cars were legally filed. Hence they are binding both on the El Dorado Company and the railway companies.

In Paragon Refining Co. v. Alton & S. R. R., 118 I.C.C. 166, 168, the shipper supplying the tank cars had been denied any payment, and the Commission awarded it 1 cent a car mile as its compensation for supplying to October 1, 1920, and ordered it be paid after October 13, 1926, 1½ cents a mile, the later uniform rate.

Such rate uniformity must apply to all shippers. It does not mean that a tariff rate established for a shipper service by certain shippers, and not for other shippers rendering the same service, may not be held invalid for discrimination. This, however, is not a determination that the tariff compensation is not "just and reasonable" for the service rendered, but that it is invalid because it lacks the uniformity of including all shippers within its provisions. Merchants' Warehouse Co. v. U. S., 283 U.S. 501, 511, 51 S.Ct. 505, 75 L.Ed. 1227.

Until the Commission determines that the established rate compensation for car supplying, based upon such averages, is not "just and reasonable" under § 1, pars. (10) to (14) inclusive of the Interstate Commerce Act, we have no power to determine that it is not. The Supreme Court has held that the reasonableness is a matter of administrative discretion, and that the courts have not the power to pass on it.

"But where the suit is based upon unreasonable charges or unreasonable practices, there is no law fixing what is unreasonable and therefore prohibited. In such cases the whole scope of the statute shows that it was intended that the Commission, and not the courts, should pass upon that administrative question. When such order is made, it is as though the law for that particular practice had been fixed, and the courts could then apply that order, not to one case, but to every case, —thereby giving every shipper equal rights and preserving uniformity of practice. Section 9 gives the plaintiff the option of going before the Commission or the courts for damages occasioned by a violation of the statute. But since the Commission is charged with the duty of determining whether the practice was so unreasonable as to be a violation of the law, the plaintiff must, as a condition to his right to succeed, produce an order from the Commission that the practice or the rate was thus unreasonable, and therefore illegal and prohibited." Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 257, 33 S.Ct. 916, 920, 57 L.Ed. 1472.

The Car Corporation offers no case arising in the 30 years since the 1906 amendment of § 15 of the Act of 1887, recognizing the right of shippers to supply instrumentalities and facilities to their carriers, in which such a shipper-supplier has been prosecuted because he has accepted a tariff rate for his services in excess of its cost. If the Car Corporation's contention be correct, there must have been scores of thousands, if not hundreds of thousands, of such crimes—yet, no Commissioner, rival shipper, or competing community has persuaded a district attorney to attempt the conviction of any offender. Realizing the significance of such absence of cases, the Car Corporation offers the brief of a district attorney on a demurrer to an indictment, where it was claimed that the shipper was not in fact the supplier, and that the lease of the cars to it was a pretense and sham. The Car Corporation's pleading of the El Dorado lease shows it was neither, but a legitimate business transaction.

The Car Corporation cites the opinion of the circuit court in Interstate Commerce Comm. v. Reichmann, 145 F. 235. This case was decided in 1906, shortly before the Hepburn amendment and 11 years before the car service amendment of 1917, under which the Commission fixed the scheduled rates for shippers supplying leased tank cars to their carriers. Though purporting to construe the Elkins Act, it does not consider its second paragraph, making criminal a carrier's deviation from such tariffs, perhaps because no such car supplying tariff was in existence.

In U. S. v. Chicago & Alton Ry. Co., 7 Cir., 156 F. 558, 26 L.R.A.,N.S., 551, there was not only no tariff filed, and hence no reason to construe par. 2 of § 1 of the Elkins Act, but the shipper was held not to have rendered any service to the railway. Id., 562. Affirmed on a divided court, Chicago & Alton Ry. Co. v. U. S., 212 U.S. 563, 29 S.Ct. 689, 53 L.Ed. 653. Cf. Inland Steel Co. v. U. S., 59 S.Ct. 415, 416, 83 L.Ed. ——, where the tariff allowance to shippers for spotting cars in shippers' yards was held not for a service to carrier; Baltimore & O. R. Co. v. U. S., 59 S.Ct. 284, 83 L.Ed. 318, tariff charge for warehousing held not for a transportation service.

In none of the other authorities cited by the Car Corporation[4] and not considered above did a court have before it a case where the shipper of the goods exercised his privilege under § 15, par. (13) or § 1, pars. (13) and (14) of the Interstate Commerce Act, of supplying car service to his carrier. All were cases where the shipper supplying no service to the interstate carrier of the goods, received a rebate from the carrier, or from some third person supplying a facility in the interstate carriage.

The Car Corporation relies on a statement of the Commission in the Refrigerator Car case (Use of Privately Owned Refrigerator Cars, 201 I. C. C. 323) that "A shipper, on the other hand, who owns no cars, but leases or otherwise obtains cars through a car line, whether privately owned or railroad controlled, under terms which place him in a more favorable position respecting the question of transportation than that *prescribed by the published tariffs* and occupied by shippers generally, is receiving an unlawful concession in violation of the Elkins Act. * * *

"We do not undertake to say that a carrier may not accept private cars if it so desires, but if such cars are accepted the carriers may not acquiesce in arrangements under which mileage earnings accruing to the car owner are paid in whole or in part by such car owner to the shipper lessee which results in the payment by such shipper of charges less than the published tariff rate." (Emphasis supplied.) 201 I.C.C. 323, 378, 382, 383.

Section 15, par. (13) and § 1, par. (14) make no distinction between shippers supplying leased cars from those they own. The Commission has recognized this in fixing the same tariff for both leased and owned cars. In the Matter of Private Cars, supra.

Since Section 1, par. (2) of the Elkins Act makes it a crime for the carrier to pay less than its published tariff, as here for tank cars supplied to it under § 1, par. (14) of the Interstate Commerce Act, we are constrained to believe that the statement of the Commission in the Refrigerator Car case contemplates a regulation by the Commission prohibiting the use of any tariff rates for supplying refrigerator cars. Their power to do this we are not called upon to decide.

The Commission confines the decision in the Refrigerator Car case to refrigerator cars, and expressly excludes tank cars from its regulation. The reasoning supporting the order on refrigerator cars may or may not be applied in a hearing in which are developed facts concerning tank cars similar to those in that case.

The Commission's power is exercised through its "orders", "directions", "regulations", or "rules" made upon hearings on specified proposed subjects of regulation. Its reasoning in deciding the regulation of one matter pertaining to interstate transportation does not displace a tariff or rate or practice, recognized as controlling in an entirely different matter. The 1½ cents per car mile tariff for tank cars, recognized in the Paragon Refining case, supra, has not been set aside or declared as not "just and reasonable" by any action of the Commission. That tariff still controls the compensation for the supply of tank cars by shippers, whether owned by them or, as here, held by them through a lease giving them control of their use.

The Car Corporation admits that it holds $18,532.78 which it should have paid to the El Dorado Company in several monthly payments if its contentions above stated are not sustained, and the El Dorado Company agrees as to the amount involved. Having established no ground for retaining these moneys from its principal and for keeping them for its own use, the Car Corporation owes the El Dorado Company this amount, together with interest computed on the several monthly balances making up the total.

Reversed.

MATHEWS, Circuit Judge.

This action was brought by appellant, El Dorado Terminal Company, a California corporation, against appellee, General American Tank Car Corporation, a West Virginia corporation, in a State court of California and, on appellee's petition, was thence removed to the District Court of the United States for the Northern District of California. July trial having been waived, the District Court tried the

---

4 Spencer Kellogg & Sons, Inc., v. U. S., 2 Cir., 20 F.2d 459; U. S. v. P. Koenig Coal Co., 270 U.S. 512, 46 S.Ct. 392, 70 L.Ed. 709; U. S. v. Michigan Portland Cement Co., 270 U.S. 521, 46 S.Ct. 395, 70 L.Ed. 713.

case, made and filed special findings of fact and conclusions of law, and thereupon entered judgment for appellee. From that judgment, this appeal is prosecuted.

The facts are not in dispute. They are, briefly stated, as follows:

Appellant is engaged in the business of producing, shipping and selling coconut oil. For the shipment of such oil by railroad, specially constructed tank cars are required. Common carriers by railroad are not required to, and often cannot, furnish such tank cars. Shippers of oil are permitted to, and often do, furnish tank cars for the transportation thereof. Such shippers may be either the owners or the lessees of such tank cars. Appellee is engaged in the business of owning tank cars and leasing them to shippers, who furnish them to carriers for the transportation of oil.

By a contract dated September 28, 1933, appellee leased certain tank cars to appellant,[1] at a specified rental per month, for a term of three years commencing January 1, 1934. The cars were to be and were furnished by appellant to common carriers for use by them in transporting appellant's oil by railroad in interstate commerce, and they were so used. By the contract, it was agreed that appellee would collect from the carriers all compensation[2] payable by them to appellant for the use of the leased cars, "according to and subject to all rules of the tariffs of the railroads," and would credit appellant's rental account each month with the amount thereof, and that, if such compensation exceeded the rentals due, appellee would pay the excess to appellant. Thus, by the contract, appellee was made appellant's agent for the purpose of collecting the compensation mentioned and accounting therefor to appellant.

As such agent, appellee did, from January 1, 1934, to May 31, 1935, collect such compensation from the carriers and, from January 1, 1934, to June 30, 1934, did account therefor to appellant. That is to say, from January 1, 1934, to June 30, 1934, appellee credited appellant's rental account each month with the amount of compensation which appellee, as appellant's agent, had collected from the carriers and, as required by the contract, paid the excess to appellant. Thereafter, notwithstanding the contract, appellee retained all compensation collected by it and refused to pay appellant any part thereof. Between June 30, 1934, and May 31, 1935, the excess of such compensation over car rentals was $18,532.78. To recover that amount,[3] with interest, this action was brought.

Appellee defended on the ground that, although required by the contract, payment of the $18,532.78 to appellant was prohibited by § 1 of the Elkins Act,[4] which provides: "[It] shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to [the Interstate Commerce Act] whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by [the Interstate Commerce Act], or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor. * * *"

Appellee stated in its answer, and here contends, that if it were to pay appellant any part of the compensation collected from the carriers in excess of the car rentals specified in the contract, such payment would be unlawful, in that appellant "would secure the transportation of property at rates less than the rates named in the published and filed tariffs of said common carriers applicable to such transportation, thereby obtaining a rebate or concession

---

[1] The contract was between appellee and El Dorado Oil Works, of which appellant is a wholly owned subsidiary. El Dorado Oil Works made the contract for appellant's benefit and, subsequently, with appellee's consent, assigned all its rights to appellant. For present purposes, therefore, the contract may be, and it is here, regarded as a contract between appellant and appellee.

[2] In the contract, this compensation was called mileage.

[3] The complaint prayed for $21,131.04, but the trial court found that the excess of compensation over car rentals for the period mentioned was only $18,532.78. This finding is not challenged by appellant.

[4] 34 Stat. 587, 49 U.S.C.A. § 41.

and an advantage or discrimination, in violation of the provisions of said Elkins Act."

This contention, which the trial court upheld, should be rejected. The carriers to which appellant furnished tank cars were and are subject to the Interstate Commerce Act. Paragraphs (10), (11), (13), (14) and (17) of § 1 of the Interstate Commerce Act[5] provide:

"(10) The term 'car service' in this Act [chapter] shall include the use * * * of locomotives, cars,[6] and other vehicles used in the transportation of property, including special types of equipment,[7] * * by any carrier by railroad subject to this Act [chapter].

"(11) It shall be the duty of every carrier by railroad subject to this Act [chapter] * * * to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful. * * *

"(13) The [interstate commerce] commission is hereby authorized by general or special orders to require all carriers by railroad subject to this Act [chapter], or any of them, to file with it from time to time their rules and regulations with respect to car service, and the commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules[8] showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this Act [chapter] relating thereto.

"(14) The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this Act [chapter], *including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it,* and the penalties or other sanctions for nonobservance of such rules, regulations or practices. [Emphasis supplied.] * *

"(17) The directions of the commission as to car service * * * may be made through and by such agents or agencies as the commission shall designate and appoint for that purpose. It shall be the duty of all carriers by railroad subject to this Act [chapter], * * * to obey strictly and conform promptly to such orders or directions of the commission, and in case of failure or refusal on the part of any carrier * * * to comply with any such order or direction such carrier * * * shall be liable to a penalty of not less than $100 nor more than $500 for each such offense and $50 for each and every day of the continuance of such offense, which shall accrue to the United States and may be recovered in a civil action brought by the United States * * *."

Paragraph 1 of § 6 of the Interstate Commerce Act[9] provides: "Every common carrier subject to the provisions of this Act [chapter] shall file with the commission created by this Act [chapter] and print and keep open to public inspection schedules[10] showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad * * * when a through route and joint rate have been established. * * *"

Paragraph (13) of § 15 of the Interstate Commerce Act[11] provides: "If the owner of property transported under this Act [chapter] directly or indirectly renders any service connected with such transportation, *or furnishes any instrumentality used therein,*[12] the charge and allowance therefor shall be no more than is just and reasonable, and the commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order * * *." (Emphasis supplied.)

The carriers to which appellant fur-

---

[5] 41 Stat. 476, 477, 49 U.S.C.A. § 1 (10, 11, 13, 14, 17).

[6] Including tank cars.

[7] Such as tank cars.

[8] In § 1 of the Elkins Act, these schedules are called tariffs.

[9] 34 Stat. 586, 41 Stat. 483, 49 U.S.C.A. § 6(1).

[10] These are the schedules referred to in paragraph (13) of § 1 of the Interstate Commerce Act. In § 1 of the Elkins Act, they are called tariffs.

[11] 36 Stat. 553, 41 Stat. 488, 49 U.S.C.A. § 15(13).

[12] As, in this case, tank cars were furnished by appellant.

nished tank cars complied with the above quoted provisions of the Interstate Commerce Act. They had, long prior to the furnishing of such cars, established rules and regulations with respect to car service, as required by paragraph (11) of § 1. They had published and filed with the Interstate Commerce Commission their schedules of rates, fares and charges (sometimes called tariffs), as required by paragraph (1) of § 6. Their rules and regulations with respect to car service had been filed with the Commission and incorporated in their schedules, as directed by the Commission,[13] pursuant to paragraph (13) of § 1.

These rules and regulations prescribed the compensation to be paid by carriers to shippers for the use of tank cars. The prescribed compensation (three quarters of a cent per car mile) was increased to one cent per car mile by order of the Commission dated July 31, 1918. In the Matter of Private Cars, 50 I.C.C. 652, 709. This was increased to 1½ cents per car mile by order of the Commission on or prior to October 13, 1926. Paragon Refining Co. v. Alton & Southern Railroad, 118 I.C.C. 166, 168. Thereafter and at all times here pertinent, the prescribed compensation for the use of tank cars was 1½ cents per car mile. This compensation has never been determined by the Commission to be unjust or unreasonable. By paragraph (14) of § 1 and paragraph (13) of § 15, supra, jurisdiction to make such determination is vested in the Commission, not in the courts. Terminal Railroad Ass'n v. United States, 266 U.S. 17, 30, 45 S.Ct. 5, 69 L.Ed. 150.

There never was any statute, rule, regulation, direction or, order prohibiting the leasing of tank cars to shippers or the furnishing of leased tank cars by shippers to carriers, or prescribing for their use a compensation greater or less than, or different from, that prescribed for the use of other tank cars, or limiting such compensation to the amount of car rentals paid by such shipper-lessees.

An order thus limiting the compensation payable to shipper-lessees for the use of refrigerator cars was made by the Commission on July 2, 1934, but that order was and is, by its own terms, applicable to refrigerator cars only, and not to tank cars. The opinion[14] which preceded the order contains a dictum to the effect that "the general principles enunciated [in the opinion] apply equally to all other types of private cars," but, obviously, that dictum was not and is not a rule, regulation, direction or order, within the meaning of paragraphs (14) and (17) of § 1 or paragraph (13) of § 15, supra. It, therefore, did not alter or in any way affect any rule or regulation with respect to tank cars.

Freight paid to the carriers on shipments by appellant was that prescribed in the filed and published tariffs. Compensation paid to appellee, as appellant's agent, for the use of tank cars furnished by appellant was that prescribed in the applicable rules and regulations, which, as we have seen, were part and parcel of the same tariffs. There is, therefore, no basis for the claim that payment of such compensation to appellant was or is prohibited by the Elkins Act.

The judgment should be reversed.

### On Petition for Rehearing.

### DENMAN, Circuit Judge.

We do not agree with the contention of the Car Corporation's petition for rehearing concerning the importance of the ruling in this case. The power of the Interstate Commerce Commission is plenary. If it regards as no longer in the public interest the continuance of the failure of the railways to supply tanks cars and the long established practice of shippers owning or leasing such cars at once to serve their own industries and the carriers, it can, inter alia, order the carriers to supply the cars to the shippers. It is properly inferable from the petition that even now, over two years after the expiration date of the Car Corporation's lease, the carriers are not required to supply tanks cars to the great industries which could not exist without their use.

The petition urges inter alia that there is no evidence of any cost to the El Dorado Company in supplying the tank cars to the three railways other than the rental charged by the Car Corporation, and hence it must be held that this is the only cost for such supplying. This ignores the fact discussed under "2" of our opinion that the El Dorado Company sued upon the breach of a contract entirely valid as pleaded; that the Car

---

[13] Procter & Gamble Co. v. Cincinnati, Hamilton & Dayton Ry. Co., 19 I.C.C. 556, 560.

[14] Use of Privately Owned Refrigerator Cars, 201 I.C.C. 323, 382.

Corporation's answer pleaded the contract in haec verba; and that on its face it is valid and enforceable. The petition admits that "It is undisputed that the Car Company was contractually obligated to credit the car mileage revenue to the El Dorado Company * * *".

The contractual obligation was, "Sixth: The First Party shall collect all mileage earned by the cars covered by this agreement and keep all records appertaining to their movements. Second party shall assist first party in following the movements of said cars by furnishing to the first party complete reports of the movements of cars, giving date, routing, and destination of each movement. The first party shall each month credit to the rental or service account of the second party all mileage earned by said cars while in the service of second party according to and subject to all rules of the tariffs of the railroads."

It is admitted the cars, while in the "service" of the El Dorado Company "earned" the mileage which the Car Corporation collected from the railways. The five immediate and successive monthly payments by the Car Corporation to the El Dorado Company of the balances of these earnings over the lease charges and rentals is a mutual interpretation of the words "credit to the * * * account of" the El Dorado Company as creating a collectible and payable credit of any net balance in favor of the El Dorado Company. There is no merit in the suggestion, first made in the petition for rehearing and contrary to the assumptions of the Car Corporation's briefs and argument, that the suit is prematurely brought by the El Dorado Company because it was only the final balance at the end of the three years that was to be paid by the Car Corporation.

The Car Corporation then asserted an affirmative defense, namely, that the payment by it to the El Dorado Company of any mileage earnings in excess of the car rental of the lease would constitute a crime under the Elkins Act, as amended, 49 U.S.C. A. §§ 41-43, and hence it could retain the excess and need not perform its agreement to pay such excess to the El Dorado Company.

There is no presumption that a lessee of tank cars has no other cost in supplying them to the railways, and our analysis of the lease showed there were necessarily such added costs which well could exceed the compensation paid by the railways. If the dictum of the Refrigerator Car case (Use of Privately owned Refrigerator Cars, 201 I. C. C., 323, 378, 382, 383) is to be interpreted as stating that a lessee of cars can have no other cost than his rentals under the lease, it obviously is wrong. We do not so interpret the dictum, for the Refrigerator Car case, at page 382, expressly recognizes that there may be other expenses than rentals.

Even if the applicable principle were that it would be unlawful for the Car Corporation to pay over to the El Dorado Company any amount in excess of the latter's cost of supplying the cars to the carriers, the Car Corporation's affirmative defense did not embody this principle, nor did the conclusions of law on which the district court based its judgment. The affirmative defense alleged: " * * * That if defendant were to credit or to pay over to the plaintiff * * * any part of the mileage payments received from said common carriers by defendant, as the owner of said cars, *in excess of the car hire or rental reserved in said agreement* [not in excess of costs], such credit and payment would be unlawful * * *". (Emphasis supplied.)

The district court, in substance, reiterated this statement in its conclusions of law.

Thus, even under a principle that a shipper-lessee's compensation for car supplying may not exceed its costs, the affirmative defense was inadequate and the judgment of the district court was based on an erroneous conclusion of law.

Moreover, our opinion shows that even had the affirmative defense stated that costs of the shipper-lessee's car supplying were less than the mileage earnings, the Car Corporation has not maintained its burden of proof to establish it.

The petition attempts to counter the effect of the second paragraph of section 1 of the Elkins Act, making it a crime for a railway to pay less than a published rate for a car service, by asserting that it was considered in the case of I. C. C. v. Reichmann, C. C., 145 F. 235, 242. In this it is in error. That case quotes section 2 on another matter, but does not consider the carrier's obligation to pay the established rates as required by the second paragraph of section 1.

The discussion under "3" of our opinion assumes that the law requiring the filing of rates for car supplying in the in-

dustries using tank cars has been complied with and that there is a duly filed and published mileage tank car rate of 1½ cents per mile as compensation to all shipper-suppliers for the use of tank cars supplied by them, recognized as filed with the Interstate Commerce Commission in Paragon Refining Co. v. Alton & S. R. R. Co., 118 I. C. C. 166, 168. Since there could be a crime committed under the Elkins Act only if there were no rate filed with or established by the Commission providing for the payment of compensation for the use of cars supplied by a lessee in the position of the El Dorado Company, the Car Corporation had the burden of proving that none was filed or established.

 The Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., requires the filing with or establishing by the Commission of such rates as are paid by the carriers for car supplying, the Elkins Act makes it a crime for the carriers to depart from such rates, e. g. to pay less, and the Car Corporation's answer admits that the mileage tariff payments were for the "use" of the cars in the El Dorado Company's service. The Car Corporation's answer does not allege the absence of a tariff compensating the El Dorado Company, and the court cannot take judicial notice of any of the thousands of tariff provisions filed with the Interstate Commerce Commission. Against the pleading seeking to establish a criminal act, we must assume that the applicable tariff is for the compensation of such a lessee-supplier as the El Dorado Company. Since the answer pleads no such defense, it does not support the judgment.

 Even assuming a pleading that there is no tariff which provides a compensation to a lessee-supplier, nowhere in the record is there proof of the terms of the tank car mileage tariff rate showing that the moneys the Car Corporation seeks to hold were not payable to the El Dorado Company, or proof of the absence of any tariff compensating a shipper-supplier in the position of the El Dorado Company. Since the burden of proving unlawfulness is on the Car Corporation, we assume the unproved rate is compensation to the lessee car supplier. There is no finding that there is an absence of such a tariff and hence the findings fail to support the judgment.

The record contains certain "rules" of the American Railway Association, providing for the payment by the carriers, often several intercommunicating lines, of the amounts of car mileage due for the tank cars which have been supplied for their hauling. These *Association* rules make the compensation provided by the mileage rates filed with the *Commission* payable on the *marks of the car owners* to such owners in certain cases regardless of whether the owners or their lessees actually supplied the service to the railways. Obviously, this is a matter of convenience, for the great car-owning companies may lease hundreds of single cars to lessees and an accounting by the railways to such individual lessees would create great cost and confusion.

These "rules" of the railways' Association refer to, but do not quote, the mileage rate allowance filed with or established by the Commission, giving its designation as "Mileage Tariff No. 7-I, I. C. C. No. 2692". Assuming they were rules of the Commission, which at the same time permits the railways' tariffs to state they are not obligated to furnish tank cars, we cannot construct from them the terms of the mileage rate allowance filed with the Commission to hold that the performance of the contract contained in the lease would constitute a crime under the Elkins Act.

Petition for rehearing denied.

MATHEWS, Circuit Judge, concurs in the result.