## BALTIMORE & OHIO RAILROAD CO. ET AL. *v.* UNITED STATES ET AL.

No. 133.  Argued December 7, 8, 1938.—Decided January 3, 1939.

*Mr. Edwin H. Burgess,* with whom *Messrs. Alex H. Elder, Thomas P. Healy, Walter J. Larrabee, Carleton*

*W. Meyer, Guernsey Orcutt, Douglas Swift, H. A. Taylor, Charles R. Webber,* and *M. B. Pierce* were on the brief, for appellants.

*Mr. J. Stanley Payne,* with whom *Solicitor General Jackson, Assistant Attorney General Arnold,* and *Messrs. Elmer B. Collins* and *Daniel W. Knowlton,* Chief Counsel, I. C. C., were on the brief, for the United States et al., appellees.

512

*Mr. John J. Hickey,* with whom *Mr. Walter W. Ahrens* was on the brief, for the Warehousemen's Protective Committee; *Mr. A. Lane Cricher* for the American Warehousemen's Assn.; and *Mr. Henry E. Foley,* with whom *Messrs. Henry Parkman, Jr.* and *Lewis H. Weinstein* were on the brief, for the City of Boston and Boston Port Authority, appellees.

MR. JUSTICE REED delivered the opinion of the Court.

The Interstate Commerce Commission entered an order on February 2, 1937, which directed certain carriers serving the Port of New York district to cease and desist on or before April 5, 1937, from permitting shippers in interstate commerce over the carriers' lines from occupying "space by lease or otherwise in warehouses, buildings or on piers owned or controlled directly or indirectly by, or affiliated with" the carriers involved "at rates and charges which failed to compensate said" carriers "for the cost of providing said space." The cease and desist order likewise directed the carriers to abstain from storing, handling or insuring goods for shippers at less than cost. One carrier was also directed to abstain from granting concessions to a warehouse company by means of leasing space to the warehouse company at less than the cost of the space to the carrier.

514

As authorized by the Judicial Code,[1] a petition in equity was filed in the United States District Court for the Southern District of New York on March 9, 1937, seeking a permanent injunction against the enforcement of the order. A hearing was had by a three-judge court pursuant to the provisions of the Urgent Deficiencies Appropriation Act of October 22, 1913,[2] and a final order dismissing the petition entered on March 23, 1938.[3] An appeal was taken directly to this Court as authorized by the Urgent Deficiencies Act and the Judicial Code.[4]

The order appealed from was entered in an investigation into "practices of carriers affecting operating revenues or expenses"[5] undertaken by the Interstate Commerce Commission upon its own motion.[6] For convenience the general investigation was divided into different parts; the one in which the order under consideration was entered is Part VI, "Warehousing and Storage of Property by Carriers at the Port of New York." The particular practices affected by the order were brought to the attention of the Commission by complaints of warehouse operators in the New York district that warehouses owned or controlled by the carriers were being operated contrary to the Interstate Commerce Act. Full reports of the investigation into the practices complained of were made by the Commission on December 12, 1933,[7] and June 8, 1936.[8] The first report terminated in an admonition; the second report was followed by an order

---

[1] § 24, subsection 28.

[2] 38 Stat. 220.

[3] For opinion below see *Baltimore & O. R. Co.* v. *United States* (I. C. C.), 20 F. Supp. 273.

[4] Judicial Code, § 238.

[5] Ex parte 104, 198 I. C. C. 134.

[6] Interstate Commerce Act, Act of Feb. 4, 1887, c. 104, § 13 (2), 24 Stat. 383, as amended; 49 U. S. C. § 13 (2).

[7] 198 I. C. C. 134.

[8] 216 I. C. C. 291.

which never became effective. This order was superseded by the Commission's order of February 2, 1937, in controversy here. This last order was entered by the Commission upon reconsideration of its former reports.[9] The Commission postponed its effective date until the injunction was brought and the lower court has entered an order for a further stay pending the determination of the appeal to this Court.

While the issues here are matters of law depending on whether admitted facts support the order, it will be helpful for an understanding of the basis of our opinion to have summarized the underlying facts found by the lower court.

The railroads affected by the order are The Baltimore & Ohio Railroad Company, The Central Railroad Company of New Jersey, The Delaware, Lackawanna & Western Railroad Company, Erie Railroad Company, Lehigh Valley Railroad Company, The New York Central Railroad Company and The Pennsylvania Railroad Company. All are subject to the Interstate Commerce Act. As common carriers they operate lines of railroad extending in a generally westward direction from the Port of New York district to various western points and compete each with the others for domestic and foreign commerce to and from the district. All united in the petition to enjoin the enforcement of the order. Their petition named as defendant the United States of America. The Interstate Commerce Commission and the Warehousemen's Protective Committee intervened. Later, orders were entered allowing the intervention of the American Warehousemen's Association, Merchandise Division; the Boston Port Authority; and the City of Boston.

It was the practice of these carriers to furnish to shippers in the Port of New York area the storage, handling and insurance which were under investigation. On ac-

---

[9] 220 I. C. C. 102.

count of the high price and great demand for storage space in the wholesale and retail business locations of New York, dealers must store their surplus stocks in low-rent sections. To serve those merchants who do not have their own warehouse facilities, numerous companies not affiliated with the carriers are engaged in the commercial warehouse business in the immediate vicinity of New York. Their business, like the warehouse businesses owned or operated by or affiliated with the carriers, not only covers the storage of goods but its handling in and out of cars and ships with all the incidental services connected therewith such as the issuance of warehouse receipts, inspection, cooperage, marking, and weighing.

Neither the complaints of the competitors of the carriers in the warehousing business nor the terms of the Commission's order are directed at the involuntary storage of goods incidental to transportation. This is the period before or after shipment during which goods occupy cars or floors without any charge above the strictly transportation rate. The warehousing practices complained of are those in connection with accessorial services of the carriers, accurately designated commercial warehousing. Examples of such services are the storage and other warehousing services furnished by the carriers or their affiliates or subsidiaries, to enable shippers to hold and handle their commodities beyond the time allowed by transportation rates and in ways not required by rail movement itself. All of the carriers "now generally store freight on piers owned or leased by them and in warehouses operated by affiliated or subsidiary companies." This business is carried on in various ways. Some carriers lease space to shippers for warehousing; others have aided in financing structures on their property in which they lease space from their own subsidiaries; and still others own directly the buildings and lease them to subsidiaries for warehouse operations. In all cases the carriers exercise sufficient

control over the warehouse facilities to make them subservient to the competitive needs of the carriers. Their entrance into warehousing was brought about by a desire to induce shippers to use particular rail facilities and as first one and then the other of the carriers gained traffic by their warehouse conveniences, it seemed necessary for their competitors to equip themselves with similar advantages. Obviously a shipper, who can secure transportation, storage, handling and insurance together from a carrier and its affiliates for an aggregate cost which is less than the sum for which he can secure the various services when purchased separately from carriers and non-affiliated enterprises, will deal with those offering the best terms. The storage largely determines the transportation route. To get the rail transportation of large shippers, the carriers sought them out and offered warehousing services and space below the rates of private warehousemen and below the cost to the carriers of the services rendered. It was not only a contest between carriers and private warehousemen but also between the carriers themselves. Traffic departments of the railroads became solicitors for warehousing business. Favored shippers were rented space by the carriers below compensatory figures. To meet the requirements of this competition the various Port of New York railroads added many new buildings in recent years. This provided many millions of square feet of space above the present needs of the district.[10]

Another form of warehousing is found in a development of the storage-in-transit privilege at the Port of New York. The carriers have rules and regulations governing this privilege which are published in separate tariffs filed with the Commission. These tariffs provide that westbound freight in carloads "from points within the free lighterage limits of New York Harbor may be

---

[10] Those interested in the details will find them in 198 I. C. C. 134, 216 I. C. C. 291, 220 I. C. C. 102.

stored in designated warehouses . . . within the Port District, and, if reforwarded by rail within the period specified in the tariffs . . . the through rate . . . from point of origin in New York Harbor to the final destination, will be applied."

As the through rate from shipside and from warehouse is the same, if the shipment moves outbound from the warehouse over the line of the inbound carrier, a shipper using carrier warehouses has the advantage of port stoppage without extra transportation cost. This tariff arrangement does not affect charges for warehousing services in connection with the storage. The storage is commercial in character and involves large tonnages. While the transportation tariffs permit varying periods of from twelve to thirty-six months for the different commodities, storage may be continued beyond this time limit at the same rate. Prior to October 16, 1934, the tariffs permitted the removal of the commodities stored at any time in any quantity and by any means of transportation without additional charge. On that date an additional charge was provided for withdrawal by means other than over the railroad which granted the storage. It will be noted that in the movement from shipside to a western destination an extra handling of the commodity is required if the warehouse is located directly on the water-front and two extra handlings if the goods must first be transported from the water-front to the warehouse and then loaded into westbound cars. The cost of these extra handlings is borne by the carrier. Insurance is furnished at a level premium rate notwithstanding the variables of the different exposures. All in all, it was determined, and this conclusion is not in dispute, that the warehouse services were performed "at rates and charges which fail to compensate" the carriers for the cost.

Through arrangements permitting distributors to avoid payment of tariff charges for storage, the Com-

mission and the District Court found that the carriers permitted distributors of flour to get unjust and discriminatory charges.

After examining the details of cost of the various carriers for warehousing, both as storage-in-transit and ordinary storage, the conclusion of the Interstate Commerce Commission was that the commercial warehousing was carried on at a substantial loss. The term "commercial warehousing" covers all warehousing practices except those strictly a part of the operation of rail transportation. This phase of the circumstances surrounding the order may be summed up in the words of the 179th finding of fact of the District Court, which reads as follows:

"In its first report the Commission pointed out that the matters and transactions referred to therein 'are further illustrations of serious waste resulting from the competition of railroads with each other for traffic.' The extent of this waste is indicated by statements contained in appendices to the report, Appendix I of which shows that the seven plaintiffs expended approximately $35,000,000 in connection with the warehouse projects considered in the report. In its second report the Commission found that up to the close of the year 1930, the cold storage industry had placed 33,688,546 cubic feet of refrigerated space on the market in the Port of New York District, and that within a period of three years thereafter warehouses affiliated with the Erie and Pennsylvania placed an additional 8,500,000 cubic feet of refrigerated space on the market, notwithstanding the fact that at the time there was an unused capacity of at least 30 per cent of the then-existing facilities; and further that as of the close of the year 1930 the 43 warehouse companies operating merchandise warehouses, other than cold storage, in the Port of New York District had placed 20,450,000 square feet of warehouse space on the market in that district, and that within six years subsequent to January

1, 1929, the plaintiffs or their affiliates placed 6,185,000 square feet of new additional merchandise warehouse space on the market, thereby, without commercial need, increasing the capacity at least 25 per cent. Appendix II of the first report shows that the loss incurred by plaintiffs in connection with their warehouse projects during the year 1931 was $1,260,441. Appendix III shows that the loss per ton of freight stored in transit during 1931 ranged from $1.28 to $6.18. These losses were added to by losses incurred on freight stored on railroad piers, and in cars, on insurance premiums, and from loans and advances. In this connection the Commission found: 'Whether or not initial advantages may have been realized at one time or another, by individual carriers, the result is that a preferred group of large shippers are now the sole beneficiaries, and are so at the expense of the carriers and the general shipping public.' And the Commission found 'that the respondents' warehousing and storage practices, charges assessed, and allowances made in connection therewith at the Port of New York district dissipate their funds and revenues, are not in conformity with efficient and economical management as contemplated by the Interstate Commerce Act, and are not in the public interest.' "

The final order of the District Court, dismissing upon these facts the petition for injunction to restrain the enforcement of the Commission's order, is attacked here upon two grounds: First, that the rendition of services to the public at less than cost is insufficient in law to establish that the carriers thereby make concessions and through such concessions are guilty of the violation of §§ 2, 3 and 6 of the Interstate Commerce Act; second, that the carriers having published and observed tariffs covering storage-in-transit cannot be guilty as to such services of violations of the same three sections.

The carriers contend that the questions involved in charges of violations of the Interstate Commerce Act by

discrimination and rebate are to be judged by the reasonable worth of the services rendered instead of by the cost to the carrier and that the charges for storage-in-transit are not warehousing costs but transportation costs and therefore it is no violation of the Act to furnish them at less than cost to the carriers.

*Warehousing Charges.*—The order, as entered by the Commission [11] and sustained by the lower court, was an

---

[11] The pertinent language of the order follows: "It is ordered, That the respondent carriers . . . be, and they are hereby, notified and required to cease and desist . . . from permitting shippers . . . to occupy space by lease or otherwise in . . . buildings, . . . owned or controlled . . . by . . . respondents . . . at rates and charges which fail to compensate said respondents for the cost of providing space;

"It is further ordered, That the respondent carriers . . . are hereby . . . required to cease and desist . . . from storing goods . . . at rates and charges which fail to compensate said respondents for the cost of storing such goods or providing such storage space.

"It is further ordered, That the respondent carriers . . . are hereby . . . required to cease and desist . . . from . . . handling goods . . . for shippers . . . at rates and charges which fail to compensate said respondents for the cost of said handling.

"It is further ordered, That the respondent carriers . . . (except The Central Railroad Company of New Jersey) . . . are hereby . . . required to cease and desist . . . from insuring goods . . . at less than the cost of providing such insurance.

"It is further ordered, That the respondent carriers above-named be, and they are hereby, notified and required to cease and desist from applying, by means of tariffs now on file with this Commission on or before April 15, 1937, noncompensatory rates and charges, as fully described in said reports, for the leasing of space, storage, handling and insurance of goods shipped over their lines in interstate commerce which goods are stored, handled or insured in connection with commercial warehousing service as fully defined and described in said reports.

. . . . . . .

"And it is further ordered, That respondent, The Central Railroad Company of New Jersey, be, and it is hereby, notified and required to cease and desist, on or before April 15, 1937, and thereafter to

exercise by the Commission of its power to cause carriers to cease and desist from practices which result in the receipt of less than the published tariffs for transportation services, with the consequence that concessions were given and preferences and advantages obtained by certain shippers. Its validity, except as it may be affected by consideration of the point that the practices were in accordance with tariffs made and filed with the Commission, depends upon whether a finding that the warehousing services were rendered at a charge below cost to the carrier authorized the order, without the further finding that the reasonable value of the service was above the charge.

It was the view of the Commission and the lower court that the finding of the Commission showed a violation of §§ 2, 3 (1) and 6 (7) of the Interstate Commerce Act.[12]

abstain, from subsidizing and granting concessions to the Newark Central Warehouse Company by means of noncompensatory rentals collected or received for the spaced leased by the Newark Central Warehouse Company from said respondent carrier, as fully described of record and in said reports."

[12] Act of February 4, 1887, c. 104, 24 Stat. 379, as amended; 49 U. S. C. §§ 2, 3 (1), 6 (7).

"SEC. 2. If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.

"SEC. 3. (1) It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in

These sections were enacted to assure the maintenance of rail transportation tariffs without rebate, discrimination or preference. No findings appear, nor has our attention been called to any evidence, which suggests the charges were made to meet the competition of the commercial warehousemen or were based upon the fair value of the services rendered, regardless of competition. On the contrary, it was the carriers' struggle to obtain line haul traffic which led them into the price cutting warfare. Charges for leases, storage, both in and out of the transit privilege, handling and insurance were alike slashed to meet the competition.

Since the tariffs for rail haul are fixed for the various points and freight classifications, every shipper must pay that tariff for his transportation. As the shippers of the Port of New York district can utilize, in many instances, commercial storage and other warehousing services in addition to rail transportation, a saving on the non-transportation services obviously figures out the same as a rebate on the transportation service. It is immaterial that the shipper pays fair value or the market price for the extra privilege he enjoys. Section 6 (7) of the Act forbids the carrier to receive less than the published rates

---

any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Sec. 6. . . . (7) . . . nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

for transportation or to remit "by any device any portion of the rates." When services, not necessary for transportation, are furnished below cost in an effort to acquire rail transportation, as was done here, this provision is violated.[13] Since the carrier warehouse rates, as found by the Court and Commission, are not open to all shippers alike,[14] there is violation of §§ 2 and 3 (1) prohibiting discrimination and unreasonable prejudice. The rail transportation rates have charged against them the loss occasioned by warehousing practices designed to attract a volume of rail business.

This is not to say that for every situation it is necessary that accessorial services should be rendered at not less than cost, rather than market or fair value. The Commission pointed out it was not condemning bona fide storage-in-transit for milling, manufacturing or processing,[15] but only the storage practices indulged in here to get rail transportation. In other circumstances fair value and market have been recognized as legitimate bases.[16] Where competitive practices such as existed here are absent, reasonable or market value charges may well be the test. The power, however, is in the Commission, whenever it is of the opinion that any practice is unjust, unreasonable, preferential or otherwise violative of the Act, to prescribe what practice will be just, fair and reasonable.[17] As in *Merchants Warehouse Co.* v. *United States* [18] the Commission "rightly secured the discontinu-

[13] Cf. *Wight* v. *United States,* 167 U. S. 512; *Seaboard Air Line* v. *United States,* 254 U. S. 57, 63; *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm'n,* 200 U. S. 361.

[14] 198 I. C. C. at 197.

[15] 216 I. C. C. 291, 356.

[16] Leases and Grants by Carriers to Shippers, 73 I. C. C. 671, 683, 684. Cf. Wharfage Charges at Atlantic and Gulf Ports, 157 I. C. C. 663, 692; *Central of Georgia Ry. Co.* v. *Blount,* 238 F. 292, 296.

[17] § 15 (1), 41 Stat. 484; 49 U. S. C. § 15 (1).

[18] 283 U. S. 501, 513.

ance of the discrimination by ordering the carriers to cease employing the means by which it had been accomplished."

*In-Transit Tariffs.*—The carriers urge additional reasons why the order is invalid as to in-transit storage. They find in the order as to it all the alleged vices of the order with respect to leases and non-transit storage, which arise from basing the minimum charges on cost rather than market or fair value. They also contend that since the charges for in-transit arrangements are and must be published in tariffs, they are a part of transportation costs and therefore may be rendered at less than cost.[19]  Even if the in-transit warehousing is not technically transportation, say the carriers, its inclusion in tariffs is sufficient to protect it from the attack that its below-cost charges violate § 6.  The carriers insist that they do not remit by any device any portion of the specified tariff charges and that, as asserted violations of §§ 2 and 3 are predicated upon violations of § 6, none of the findings as to in-transit charges supports the orders.

The Commission found that the in-transit warehousing was not a part of transportation.  This finding is not affected by the determination of the Commission that the rates and charges should be published in the tariffs. Indeed, in its report on the subject the Commission said "What is here condemned is the fact that the respondents have voluntarily engaged in storage and warehousing services which are not within their common-carrier obligations and, by providing such services to shippers below the cost of such services, reduce the cost to such shippers for the transportation of their goods.  The tariffs now on

---

[19] *Cleveland, C. C. & St. L. Ry. Co.* v. *Dettlebach,* 239 U. S. 588; *St. Louis & San Francisco Ry. Co.* v. *Gill,* 156 U. S. 649, 665, 666; *Atlantic Coast Line* v. *North Carolina Comm'n,* 206 U. S. 1, 26–7; *Northern Pacific R. Co.* v. *North Dakota,* 236 U. S. 585, 600; *Minneapolis & St. L. R. Co.* v. *Minnesota,* 186 U. S. 257, 268.

file are instruments which work violations of the act in that, through them, respondents hold themselves out to perform commercial services (under the guise of performing transportation services) at rates and charges which fail to compensate respondents for the cost of performing them, and thereby violate sections 2, 3, and 6 of the act." [20]

We accept this conclusion. [21] If the service is non-transportation, the fact that it is in a tariff does not save it from the condemnation of § 6 (7). That section forbids receiving a less compensation for transportation than the tariff. The loss on in-transit warehousing, entered into to secure the rail-haul, results in lowered receipts for the transportation and in violation of the section. Some shippers are not in a position to avail themselves of the below-cost in-transit service. They must pay the full transportation rate, without any offset from the warehousing. This discrimination between shippers is unlawful and the remedy applied by the order valid in these circumstances.

*Conclusion.*—We do not discuss the suggestion that the order deprives the carriers of their liberty and property contrary to the Fifth Amendment. If, as here held, the order is a valid regulation of rates for warehousing services which affect transportation tariffs, it cannot be unconstitutional. Appellants' contention of unconstitutionality is predicated on the invalidity of the order under the Interstate Commerce Act.

*Affirmed.*

[20] 220 I. C. C. at 103–104.

[21] *United States* v. *American Sheet & Tin Plate Co.*, 301 U. S. 402, 406.