**UNITED STATES et al. v. UNION PAC. R. CO. et al.**

No. 440.

District Court, W. D. Missouri, W. D.

July 8, 1940.

For opinion on application for temporary injunction see 32 F.Supp. 917.

Burt L. Smelker and Walter R. Taylor, both of Washington, D. C., and Thomas A. Costolow, of Kansas City, Mo., for plaintiffs.

Henry N. Ess and Charles Whittaker (of Watson, Ess, Groner, Barnett & Whittaker), both of Kansas City, Mo., and Robert F. Maguire, of Portland, Or., for defendant Union Pac. R. Co.

Alton H. Skinner, of Kansas City, Kan., pro se, for defendants Kansas City, Kan., and others.

John Murphy (of Harding, Murphy & Tucker), of Kansas City, Mo., for defendants Robinson and others.

**6**

Phineas Rosenberg, of Kansas City, Mo., for defendants De Oreo and another.

J. John Gillis, of Kansas City, Mo., for defendants Garrett Holmes & Co., Inc., and another.

J. C. Gibson and Roland J. Lehman, both of Chicago, Ill., and John N. Monteith (of Lathrop, Crane, Reynolds, Sawyer & Mersereau), of Kansas City, Mo., for A., T. & S. F. R. R.

Hale Houts (of Hogsett, Murray, Trippe, Depping & Houts), of Kansas City, Mo., for C., R. I. & P. R. Co.

Ilus M. Lee, Charles M. Howell, Jr., and Floyd E. Jacobs, all of Kansas City, Mo., for Kansas City, Mo.

Leonard Ulmann, of Kansas City, Mo., pro se.

Walter M. McFarland, of Chicago, Ill., for C., B. & Q. R. R.

Leslie A. Welch, of Kansas City, Mo., for Missouri Pac. R. Co.

COLLET, District Judge.

The parties have stipulated that the record made on the hearing of the application for the preliminary injunction is to be considered by the Court as a part of the record on final hearing. Although the issue on application for preliminary injunction is frequently stated to involve only the existence of probable cause for the issuance of the restraining order, yet the facts then presented were developed with such completeness by all parties that practically no additional testimony was offered on those questions at the hearing on the merits. Since the evidence was weighed and the factual conclusions arrived at on the hearing of the application for the preliminary injunction reflected the greater weight of the evidence, the findings of fact and conclusions of law filed herewith are to a large extent repetitions. On the final hearing a substantial amount of additional evidence was offered relating to the rate of return earned from existing rental rates. The question as to whether those rental rates are so low that unlawful concessions result, has been seriously urged for the first time on the final hearing. For that reason findings and conclusions bearing on that question now appear for the first time.

Since the opinion filed at the time the preliminary injunction was under consideration dealt fully with the legal questions there determined, only those questions arising upon the final hearing will be considered at this time. Those questions may be briefly stated as follows:

(1) Does the Court have power to fix a minimum rental rate "until further order of the Court" in order to prevent future rental concessions, and

(2) Are the present rental rates so low that interstate shippers paying those rentals thereby receive concessions? Those questions may be briefly answered.

The Court has no power to fix permanent minimum rental rates even until further order of the Court. It may only enjoin rebates or concessions conferred by inadequate rates. While it may forbid the offering of such rental advantages as will constitute rebates or concessions, rate making is not a proper prerogative of the Court. General American Tank Car Co. v. Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361. The present inquiry will be directed to the determination of whether existing conditions disclose a present violation of law. The legality of future conditions will be determined in the light of facts and circumstances then existing. It will not be presumed that future violations will occur.

In determining whether present rental rates constitute concessions and rebates the fair value of the property will be considered without regard to the source of the capital with which it was acquired. An overall net return of from 2% to 3% will result from 90% occupancy at present rentals after providing for interest and amortization on bonded indebtedness representing approximately 55% of total fair value and a proper depreciation allowance on all depreciable property.

In determining what rate of return will constitute an intentional and unlawful rebate or concession with respect to interstate transportation, economic conditions generally in the community will be considered. The return realized on a particular enterprise will be considered only to the extent of its comparative similarity to the enterprise in question. Fair return, as that term is used in utility regulation, does not measure lawfulness. Nor is confiscation in its strict legal sense determinative of illegality. Only such rentals as will result in returns so meager that the owner would be unwilling to operate the property therefor, absent an improper motive, will result in unlawful concessions. And the conclusion of lawfulness

or unlawfulness will be reached only after considering the nature of the enterprise, the profits generally realized from like enterprises, the resulting incidental and collateral benefits, the use to which the improvement is to be devoted, and other related considerations.

While the Food Terminal was conceived and fostered by the Union Pacific and the promoters in conjunction with the City, the general nature of the enterprise is such that it is properly classified as one from which general benefits will inure to the entire community. Public markets have existed almost from the beginning of mankind. The recorded history of civilization is replete with references to the early custom of the sovereignty furnishing at little or no cost, a place where the articles of common use may be offered for barter or exchange. The Food Terminal is a modern and glorified development of the ancient market places. It is admirably adapted to the handling of foods of general daily need. A city or community possessing a utility such as this Food Terminal may well be considered fortunate. A city government with due regard for the well being of the community may in good faith conclude that the general good to be derived from such an enterprise justifies the exaction of less than the "full, fair return" in money to which it and public utilities financed by private capital is entitled to demand. Hence, "fair return" as that term is used in utility regulation, is not the criterion for determining the existence or absence of an unlawful intention to make a personal gift to tenants who are necessary to the success of the enterprise. The sum for which the City may lease its property and still avoid the charge of donating the use of that property may and should be governed to some extent, at least, by the resulting general public benefit which the City Government is obligated to advance.

Evidence of the return received from elevator properties located in the same community is of little, if any, value in testing the proper return which should be derived from the Food Terminal. The utilities are so radically different in so many respects that the comparison of revenues can serve no helpful purpose.

The current low rates of interest on securities of the class universally accepted as the exemplification of security are to be considered, not as an absolute criterion, again because of dissimilarity in the purpose of the investors, and also because of the difference in the safety of the investment and other factors. Ordinarily, return from investment in Government securities may safely be accepted as the lowest return which an investor would voluntarily accept. For that reason, if the Food Terminal was not endowed with the characteristic of performing a general public good and was not owned by one who was properly chargeable with promoting that public good as well as conserving the investment, plaintiffs' assertion that the rate of return from the Food Terminal should exceed the current return on Government securities would receive application. But since, as noted, other proper considerations may and should actuate the city-owner in determining a proper return in this case, the return on Government securities will not control.

It is argued by defendants that the effect of Baltimore & Ohio Ry. Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, is an approval of a return that is merely compensatory. While that case may indicate such a conclusion on the part of the Interstate Commerce Commission, the Supreme Court merely approved the action of the Commission in forbidding rates which failed to compensate the carriers for actual cost of providing the facilities and did not pass upon the question of whether an order of the Commission requiring a return in excess of actual cost would have been proper, the latter point not being presented by the record.

What has been said will sufficiently indicate the theory upon which the conclusion is based that the present rental rates are not so low that they may be held to result in unlawful concessions.

A formal decree consistent with the conclusions stated will be filed.