## INTERSTATE COMMERCE COMMISSION v. NORTH PIER TERMINAL CO.

### No. 9420.

Circuit Court of Appeals, Seventh Circuit.

Nov. 19, 1947.

Rehearing Denied Jan. 9, 1948.

MAJOR, Circuit Judge, dissenting.

Robert N. Burchmore and John S. Burchmore, both of Chicago, Ill. (Walter, Burchmore & Belnap, of Chicago, Ill., of counsel), for appellants.

Colin A. Smith, of Chicago, Ill. (James A. Murray and Gregory U. Harmon, both of Washington, D. C., of counsel), for appellee.

Before EVANS and MAJOR, Circuit Judges, and BRIGGLE, District Judge.

EVANS, Circuit Judge.

The I.C.C. assails, as illegal, a 4¢ per hundred weight payment made by twenty motor carriers to the Terminal Company (one of the defendants herein) for services in assembling and handling the freight of its tenants, for shipment by the respective carriers. The I.C.C. brought suit under 49 U.S.C.A. §§ 304 (a) (6), 322 (b)* for, and obtained, on motion for summary judgment, an injunction against the continuance of the practice of making such payment. The motor carriers and the Terminal Company both appeal.

The parties have stipulated as to most of the material facts.

The controversy arises out of a somewhat peculiar situation of the parties. The Terminal Company is the owner of a six-story building in Chicago, a third of a mile long, housing at least 75 shippers, who each handle a large volume of freight. The building has a loading platform its entire north length. Seventy-eight doors lead onto the platform, and freight is loadable from the platform to truck or railroad cars drawn alongside. There are also loading platforms on the south side of the building. However, the congestion of trucks was such that the Terminal Company furnished the facility of a room—or station—at each end of the building, to which the tenants, themselves, bring their outgoing freight, upon carts furnished by the Terminal Company. The Terminal Company's employees located in the stations furnish the tenants blank bills of lading in the trucker's name, for the goods, and sorted the shipments out for the respective truckers and stored the shipments until they were picked up. The Terminal Company employees notified the trucking companies to pick up the freight.

The practice, whereby the carriers paid the Terminal Company 4¢ per hundred weight, began more than six years ago and crystallized into a written contract between the Terminal Company and the defendant motor carriers.

Not all the tenants in the building availed themselves of this service. Not all motor carriers handling freight from the building were parties to the Terminal Company agreement. More than one hundred motor carriers handle shipments at the building.

The Terminal Company kept records and at the end of each month, upon presentation of the statements showing shipments, the motor carriers paid to it the 4¢ per hundred weight fee, earned during the month by the Terminal Company.

The stipulation also provided that "In bringing shipments to the stations, shippers use their own employees at their own expense, and bring the shipments to the stations by way of the loading dock. In some cases the shipper brings the shipments to the station on hand lift trucks or skids which are the property of the shipper, and in some cases uses hand lift trucks or skids which are the property of the terminal company. In the past employees of the terminal company have, in some few instances, received such shipments at premises of shippers, located on the first floor of the building."

The motor carriers have on file with the I.C.C. tariff schedules for the services involved in the shipments here concerned. In these schedules there is no provision for

---

* For violation of 49 U.S.C.A. § 322(c), 49 U.S.C.A. § 317(b), and 49 U.S.C.A. § 324a.

164 F.2d—41

services here performed by the Terminal Company, or for the payment of part of the freight charges to it.

The District Judge concluded as a matter of law that the payments by the carriers to the Terminal Company were in effect payments to the shipper and rebates within the condemnation of Sections 217 (b), 222 (c) and 225 of the Interstate Commerce Act, 49 U.S.C.A. §§ 317 (b), 322 (c), and 324a. Since such payments were not covered by the published tariffs, they were illegal, and an injunction restraining such payments should issue.

These statutes provide:

"Sec. 217 (a). Every common carrier by motor vehicle *shall file with the Commission* * * * *tariffs showing all the rates,* fares, and charges for transportation, and all services in connection therewith, of passengers or property in interstate or foreign commerce. * * *" 49 U.S.C.A. § 317 (a).

"Sec. 217 (b). *No common carrier by motor vehicle shall charge* or demand or collect or receive a greater or less or different compensation for transportation or for any service in connection therewith between the points enumerated in such tariff *than the rates,* fares, and charges *specified in the tariffs* in effect at the time, and no such carrier shall refund or remit in any manner or by any device, directly or indirectly, or through any agent or broker or otherwise, any portion of the rates, fares, or charges so specified, or extend to any person any privileges or facilities for transportation in interstate or foreign commerce except such as are specified in the tariffs." 49 U.S.C.A. § 317 (b).

"Sec. 225. If the owner of property transported under this part directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, *the charge and allowance therefor shall be published in tariffs* or schedules filed in the manner provided in this part. * * *" 49 U.S.C.A. § 324a.

"Sec. 222 (b). If any motor carrier or broker operates in violation of any provision of this chapter, * * * the Commission or its duly authorized agent may apply to the district court of the United States for any district where such motor carrier or broker operates, for the enforcement of such provision of this chapter * * *; and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or by other process, mandatory or otherwise, restraining such carrier or broker, his or its officers, agents, employees, and representatives from further violation of such provision of this chapter * * * and enjoining upon it or them obedience thereto. * * *" 49 U.S.C.A. § 322 (b).

Sec. 322 (c) of 49 U.S.C.A. defines the criminal offence of unjust discrimination.

The heart of the appellants' position is that the carriers' payment of 4¢ per hundred weight is to one *other than the shipper,* and therefore needs no publication in its tariffs, and is violative of neither statute nor published tariff. As an added basis for its position, it asserts that the assembling rooms at the building were "stations" and therefore legally permissible establishments.

Appellants earnestly contend that the Terminal Company was the agent of the carriers and not the agent of the shippers. They point out also that even less service is given the shippers than is provided in the tariffs, in that the shippers bring the freight to a greater distance to the Terminal Company's rooms, rather than merely down to the first floor freight exit.

An examination of the statutes and the decisions cited, gives emphasis to the peculiar conditions of the instant case. These facts weaken the precedents relied on, although they give perspective and content to the detailed provisions of the statutes.

Our reading of the statutes above quoted, convinces us that Congress intended to compel carriers to exact identical charges for identical service between the same points of service. Congress seemed determined to prohibit even the slightest deviation from such norm. Moreover, they required the filing of rate schedules which in turn governed the rates to be charged, and impliedly defined what would be rebates of them.

Were we approaching this problem as an original proposition, without prior reading

of the statute and decisions, we would have strong inclination to approve of any voluntary arrangement whereby parties simplified and expedited shipments in an efficient manner, without seeming detriment to others, for we are unable to appreciate how a shipper actually benefits by the Terminal Company's services, except for the availability of carts for carrying the merchandise to the "stations" of the Terminal Company, and these carts seem to be available to all tenants.

A reading of the statute, however, in our judgment, makes mandatory an affirmance of the injunctional order. Sec. 217 (a) requires a "[filing] with the Commission * * * [of] tariffs *showing all the rates * * * for * * * all services".* True, it might be said the section comprehends *charges* by, instead of payments by, the carriers. So we go on to Sec. 217 (b) which provides that the carrier shall not receive a "less or different compensation for transportation * * * between the points enumerated in such tariff that the rates * * * specified, in the tariffs * * * and no such carrier shall *refund or remit in any manner or by any device,* directly or indirectly, or through any agent, or broker, or otherwise, any portion of the rates * * *." The motor carrier received in fact less than the tariff listed because it paid out 4¢ per hundred weight for extra services.

When Congress in the language just quoted went to such great lengths to cover all conceivable situations which a carrier's ingenuity in solving situations might devise, we can not construe such language to require the rebate or refund to be to the one making the original payment—the shipper. Probably such rebate is usually in fact made to the shipper. Here it was not. If Congress had intended to limit proscribed rebates to shipper, it could easily have so stated. Instead, it seemed bent on traveling in the other direction—away from narrowing restricted or condemned rebates.

■ In the case of Union Pacific Railroad Company v. United States, 313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453, we have authority for holding that the rebate which is prohibited need not be to the shipper.

■ The motor carriers point out that they comply precisely with their published tariff both as to rates and as to point of pick-up. The I. C. C. however challenges the assertion as to accessibility of point of pick-up from the Terminal-maintained stations; and also argues that the published tariff—on its face an impartially equal one —is defeated by the later payment of 4¢ per hundred weight, to the Terminal Company.

The Sixth Circuit Court of Appeals had occasion to consider an analogous statute, 49 U.S.C.A. § 322 (c), which in effect makes it a criminal offense to give a rebate or concession. In C. & D. Motor Delivery Co. v. United States, 150 F.2d 250, 252 the court upheld the sentence against a Terminal Warehouse, Inc. The information there charged a carrier with payment of $2.26 as an allowance for assembling and loading services. The carrier's tariff had provided that "no accessorial services such as inside collection or delivery" be performed. The Court stated

"* * * the Delivery Co. was prohibited by the tariff from performing such service and the court was fully justified in concluding that when Warehouses, as a representative of the shipper, received payment for such services from the Delivery Co. the receipt was clearly a 'concession' 'received' within the meaning of Sec. 322 (c).

"The evil of such practice is obvious. As long as the Delivery Co. paid Warehouses as the representative of the shipper for services which were not included in transportation services regulated by the tariff, Warehouses would naturally select the Delivery Co. over other carriers. See Baltimore & Ohio Railroad Company v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318; United States v. Wabash Railroad Company, 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827."

Interesting language was used by a three-judge court in the case of Terminal Warehouse Company v. United States, D.C., 31 F.2d 951, 953, in which case an unlawful rebate was held to have been made where a carrier made allowance to a warehouse company for performance of terminal services in connection with loading and unloading

carload package freight, which services were without charge to shippers, and where similar allowance was denied competing warehouse company. The court said:

"* * * while the services paid for are ostensibly rendered to the carrier, they are in reality performed for the benefit of the owners of merchandise intrusted to the warehouse for storage or distribution. * * * But it is not a sufficient answer to say that the allowance is not paid to the shipper or consignee. In any event, it is paid by the carrier for a service rendered to the shipper's goods, and, unless the service is performed for all shippers alike at the carrier's station, it may not lawfully be given, under the terms of the tariff or of the act of Congress. * * * Moreover, the discrimination benefits not merely the Warehouse Company, but also the owners of the goods intrusted to its care.

"We think, also, that the allowance constitutes a rebate in violation of section 2 of the act, (49 U.S.C.A. § 2). It benefits both the warehouse company and its patrons, and may fairly be said to constitute a device by which the carrier indirectly receives from them a less compensation for services rendered than it demands and receives from other persons for like service in the transportation of like goods under substantially similar circumstances."

The decree is affirmed.

MAJOR, Circuit Judge (dissenting).

The sole issue before this court, as clearly shown by the briefs, is whether the services were rendered by Terminal as an agent of the carriers and on their behalf or whether such services were rendered as agent and on behalf of the shippers. If the services were rendered in the former capacity, they were a part of the carriers' transportation duties and permissible under the tariffs on file. On the other hand, if they were rendered in the latter capacity, they were of benefit to the shippers, thereby constituting a favoritism, and illegal under the carriers' operating tariffs. The court below recognized this issue and predicated its order upon the conclusion that the Terminal "stands in the shoes of the shipper."

I agree with the Commission that this order can be sustained only on the theory that the Terminal was acting for and on behalf of the shippers, but I disagree with the Commission that there is any room for such a conclusion on the facts as stipulated. The majority, as I understand the opinion, ignores this vital issue upon which the case was tried below and upon which it is presented here, and holds that the services were illegal, irrespective of whether the services performed by Terminal were on behalf of the carriers or the shippers.

No good purpose could be served in citing or reviewing the cases, but I make bold to assert that no court has heretofore gone so far. I suspect that the Commission will be equally surprised with the carriers at the holding.

The cases cited in the opinion, as shown by the quotations therefrom, as well as all other cases so far as I am aware, are based upon the fundamental theory that payments made or services rendered by a carrier to a shipper or its representative and for its benefit constitute an illegal concession resulting in discrimination against a competitor. Notwithstanding such cases, the matter of discrimination or favoritism is apparently regarded by the majority as immaterial and is ignored. In fact, the opinion concedes, "for we are unable to appreciate how a shipper actually benefits by the Terminal Company's services." Thus, it appears the majority finds no support for the Commission's theory that the Terminal was the agent of the shippers and that its services were rendered on their behalf.

The burden was upon the Commission to prove its contention that Terminal rendered its services on behalf of the shippers. In my opinion, the Commission not only failed to prove but the stipulated facts refute its theory. Each of the numerous carriers doing business at the warehouse building was free to employ or not to employ the services of Terminal, and each of the many shippers located in the building was equally free to utilize or not to utilize the services which the carriers through Terminal as their agent had provided. The agreement between the carriers and Terminal, made a part of and recognized by the stipulated facts as the existing agreement between the parties, provided: "The Terminal Company will receive all shipments of property

tendered to the carrier for transportation at the Union Station * * *." Certainly it cannot be thought under such circumstances that any shipper in the building was favored or discriminated against. The carriers through their agent furnished the service for their own convenience and economy, and it was available to all shippers alike.

Of course, it may be argued that the services performed by these carriers were not available to shippers other than those located in the warehouse building, but the point is that there is no proof in this respect. It will be time enough to inquire into that situation when there is a refusal on the part of the carriers to provide for shippers located elsewhere and similarly situated facilities equal to those which are now made available to those located within the building. It is also pertinent to note that no competitor of the instant carriers or of the shippers, has complained of any discriminatory practices of which the Commission complains. In my view, the discrimination and favoritism which the Commission professes to discern and upon which it relies for an affirmance is without substantial support in the record. It may properly be characterized as a figment of the imagination.

In my judgment, the order appealed from should be reversed.