**BALTIMORE & O. R. CO. et al. v. UNITED STATES et al.**

**No. 10741.**

United States Court of Appeals
Third Circuit.

Argued Jan. 19, 1953.

Decided Feb. 12, 1953.

Theodore Voorhees, Philadelphia, Pa. (Windsor F. Cousins, Philadelphia, Pa., Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for Pennsylvania R. Co.

A. W. Hesse, Jr., Philadelphia, Pa., on the brief, for Reading Co.

L. J. Huegel, Baltimore, Md., on the brief, for Baltimore & O. R. Co.

Daniel M. Friedman, Sp. Asst. to Atty. Gen. (Newell A. Clapp, Acting Asst. Atty. Gen., Max E. Halpern, Assistant General Counsel, Joseph A. Klausner, Chief, Regulation Branch, Edward Aptaker, Attorney, Federal Maritime Board, Washington 25, D. C., on the brief), for respondents.

Paul F. Barnes, Robert H. Shertz, Shertz, Barnes & Shertz, Philadelphia, Pa., on the brief, for Pennsylvania Motor Truck Ass'n.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This case involves a question of the jurisdiction of the Federal Maritime Board and also the correctness of an order issued by it. The order directed the petitioning railroads to increase from two to five days the "free time" allowed for the loading and unloading of local freight which moves by truck over the railroad piers in Philadelphia. Free time refers to the allowance of a certain period during which no charge is made for the storage of freight on the pier. Following the expiration of free time demurrage is charged. The petitioning railroads contend that the Board is without jurisdiction to make the order which it has made in this case. Secondly, they contend that the order is unreasonable, not supported by substantial evidence, and should be vacated by this court.

## I.

We turn first to the jurisdiction question. The railroads say that in interstate and foreign commerce they are subject to the jurisdiction of the Interstate Commerce Commission. No one, we take it, doubts this. They say, further, that since they are under the jurisdiction of the Interstate Commerce Commission they are not subject to orders by the Federal Maritime Board. They are on less solid ground in urging

this because the Interstate Commerce Act expressly provides that nothing contained in it shall interfere with the jurisdiction otherwise exercisable by the Federal Maritime Board.[1]

But why are railroads having piers in Philadelphia subject to the jurisdiction of a Board which deals with matters concerning the carriage of goods on the water? The answer to this question is found in Section 1 of the Shipping Act, 46 U.S.C.A. § 801. The words are worth quoting:

"The term 'other person subject to this Act' means any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water."

The words to be emphasized are found in the last part of the quotation and bring under the act those who furnish "wharfage, dock, * * * or other terminal facilities in connection with a common carrier by water."

What happens is this. The railroads own piers in Philadelphia. As a matter of fact they own 13 out of a total of 18 piers which are presently in use in the city. Ships come to these piers at the invitation of the railroads. The ships do not pay for the privilege of using the piers but the railroads expect and do get freight business by having the ships unload at piers owned by them. Some of the freight which is taken off these ships is picked up by trucks which are not owned by the railroad. The railroads charge five cents per hundredweight as a "top wharfage" charge and they open their piers, under regulations imposed and policing by them, for the truckers to take away some of the freight unloaded from the ships.[2]

▆▆▆ In connection with ocean-going freight transportation, it is a common law obligation of the carrier to provide reason-

1. 49 U.S.C.A. § 920(b) (3).

2. The government calls our attention to testimony of the Pennsylvania Railroad's Assistant General Freight Agent that approximately 50% of local freight passing over that railroad's piers is transported by trucks. Total freight during a nine month period in 1950 was 40,000 tons of truck freight and 134,000 tons of rail freight.

able facilities for the loading and unloading of cargo.[3] Water carriers coming to the Port of Philadelphia, with one exception,[4] do not own piers. Instead, they use, among others, piers owned by the railroads. If the railroads, for their own business reasons, provide the facilities which it is the obligation of water carriers to furnish, it becomes very clear to us that they are furnishing "wharfage, * * * in connection with a common carrier by water." It seems to us inescapable that they come within the very terms of the Shipping Act.

That this may subject the petitioners in some respects to regulation by the Federal Maritime Board and in other respects by the Interstate Commerce Commission does not make such regulation unlawful, however much multiplicity of regulation may trouble a business enterprise.[5] We are advised that the two regulatory bodies have joint hearings on occasions where problems presented make that desirable.[6] Be that as it may, this case does not present so far as we are now advised any questions of a clash of jurisdiction, or contradictory rules laid down by the two regulatory bodies. If, as and when that happens, the problems raised by such a set of facts will be answered as best we can at the time. All we are deciding about that point in this decision is that these railroads who open their piers, for a charge, to truckers to take away or bring cargo to or from sea-going ships are subject to regulations under the terms of the Shipping Act. As said by the Supreme Court in *California v. United States*, 1944, 320 U.S.

577, 586, 64 S.Ct. 352, 356, 88 L.Ed. 322: "whatever may be the limitations implied by the phrase 'in connection with a common carrier by water' which modifies the grant of jurisdiction over those furnishing 'wharfage, dock, warehouse, or other terminal facilities', there can be no doubt that wharf storage facilities provided at shipside for cargo which has been unloaded from water carriers are subject to regulation by the Commission." See also *United States v. American Union Transport, Inc.*, 1946, 327 U.S. 437, 66 S.Ct. 644, 90 L.Ed. 772.

## II.

Is the Board's order reasonable and supported by substantial evidence? When we pass from the question of jurisdiction to consider the merits of the order to which the railroads object so vigorously, we find ourselves confronted with difficulties raised by the form of the Board's report. This report contains a summary of the complaint filed and other procedural matters in the case. It contains some statements of fact which will be discussed more fully presently. It summarizes testimony of witnesses in rather considerable detail. It states some propositions of law and then gives an overall conclusion as to what it deems the merits of the case, followed by its order.

The terms of the Administrative Procedure Act, which regulates every "adjudication required by statute to be determined on the record after opportunity for an agency hearing," [7] provides that: "All decisions * * * shall * * * include a statement

3. In the case of water-borne freight, delivery is not made until the goods are landed on a wharf, segregated from other goods so as to be conveniently accessible to the consignee, and notice given to the latter. The Eddy, 1866, 5 Wall 481, 72 U.S. 481, 18 L.Ed. 486; The Titania, 2 Cir., 1904, 131 F. 229.

4. The Merchants & Miners S. S. Company. Almost all piers not owned by the railroads are owned by the City of Philadelphia or the United States. One of these, however, is presently operated by the Ericsson Line.

5. In Baltimore & Ohio Railroad Co. v. United States, 1939, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318, an order of the Interstate Commerce Commission, direct-

ing railroads serving the Port of New York to cease furnishing warehouse space to shippers at less than cost, was sustained. No question of conflicting jurisdiction between the Interstate Commerce Commission and the Maritime Commission was raised.

6. Interchange of Freight at Boston Terminals, 2 U.S.M.C. 671 (1942), was a Maritime Commission hearing held jointly with the Interstate Commerce Commission, Interchange of Freight at Boston Piers, 253 I.C.C. 703. The former examined the railroads' wharf practices, and the I.C.C. considered the absorption of wharfage charges by the railroads in their rates.

7. 5 U.S.C.A. § 1004.

of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record * * *." [8]

A similar requirement is found in the Federal Rules of Civil Procedure No. 52(a), 28 U.S.C., which requires of the trial judge in a case tried to the court to "find the facts specially and state separately its conclusions of law thereon * * *."

■ This court and others have held that if the trial judge makes his findings and they are sufficiently clear to see what he has found, it is not reversible error if he does not list them in a 1-, 2-, 3-, 4- order,[9] although it is exceedingly convenient when they are so spelled out and numbered. The same latitude should be allowed a commission or board, although it may be remarked in passing that it is always helpful to a court called upon to review agency action to have the fact-findings of such agency clearly and categorically stated.[10]

■ We have gone through the report of the Board in this case and endeavored to separate its conclusions of fact from the other parts of the report mentioned above. We find fact conclusions on the business of the truckers, on the number of piers in Philadelphia, on the two-day allowance of free time by the railroad and other piers in Philadelphia, also the point at which free time begins. The findings of fact tell us

the type and condition of the Philadelphia piers owned by the railroads and the charge made by them for top wharfage. We learn that there is normally no business relation between truckers and railroad representatives on the pier. We read that respondents bill shippers or consignees for pier storage charges; we learn how trucks are loaded and the hours during which they can be loaded and the way in which shippers are notified of the expected arrival of ships for export cargo.

We are likewise given a finding that a substantial part of truck cargo is regularly unable to be removed within the two-day period, and that the piers handle a very substantial amount of truck cargo. It is found that respondents have solicited vessels to load and discharge at their piers in anticipation of freight business from this operation. The fact is found that there has been no unjust discrimination in allowance for rail cargo and truck cargo. And there is no discrimination with respect to top wharfage charges as between railroad and truck cargo.

The statements just set out we find categorically stated in narrative form in the course of the report of the Board.

But out of these findings we do not see a basis for a conclusion that the railroads have imposed unreasonable regulations in violation of Section 17 of the Shipping

---

8. 5 U.S.C.A. § 1007(b).

9. This court said in Hazeltine Corp. v. General Motors Corp., 3 Cir., 1942, 131 F.2d 34, 37: "The failure of the trial judge to comply literally with the provisions of Rule 52(a), although it has been characterized as a 'dereliction of duty', is not always a ground for reversal and remand with instructions to make specific findings as required by the Rule. The latter course of action has been adopted where there was an inadequate statement of facts upon vital issues and where such factual issues were not resolved. If, however, the opinion of the trial judge afforded a 'clear understanding of the basis of the decision below' and resolved the major factual disputes, the mere formal requirement of separation of findings of fact and conclusions of law has been held not sufficient to necessitate a reversal."

See also Alger v. United States, 7 Cir., 1948, 171 F.2d 667; Ginsberg v. Royal Ins. Co., 5 Cir., 1950, 179 F.2d 152. Where no facts are in dispute, no findings of fact are required. Aetna Life Ins. Co. v. Meyn, 8 Cir., 1943, 134 F.2d 246; Simpson Bros. v. District of Columbia, 85 U.S.App.D.C. 275, 179 F.2d 430, certiorari denied 1950, 338 U.S. 911, 70 S. Ct. 350, 94 L.Ed. 561. And where the court adopts the enumerated findings of a Master it need not itself separately list the findings. Green Valley Creamery v. United States, 1 Cir., 1939, 108 F.2d 342.

10. Capital Transit Co. v. United States, D.C.1951, 97 F.Supp. 614. See also N. L.R.B. v. State Center Warehouse & Cold Storage Co., 9 Cir., 1951, 193 F. 2d 156. But cf. Atlanta & St. Andrews Bay Ry. Co. v. United States, D.C.M.D. Ala. 1952, 104 F.Supp. 193.

Act.[11] We have read in the testimony the account of the troubles of the truckers and the rebuttal to that testimony given by the respondents. But it is not our function to find whether the picture is as black as the truckers have painted or free from blots and blemishes as the respondents' witnesses would have the trier of the facts believe. And on this and similar pieces of testimony the only help we get from the report is the overall conclusion at the end which, as will be seen as we set it out, is almost as general as a verdict of a jury from whom special findings have not been asked. This is what the Board concludes:

"1. That the respondent railroad companies should modify their tariff regulations so as to allow not less than five days free time for inbound and outbound cargo handled over their Philadelphia piers by truck;

"2. That any storage charges on truck cargo brought to respondents' piers at Philadelphia for shipment by water carrier, when delivered to the piers in accordance with instructions from the water carrier, should be charged against the water carrier and not against the shipper of such cargo; unless unforseen causes beyond the control of the water carrier delay the loading of such cargo, and the water carrier notifies the shipper to remove such cargo or be responsible for further storage charges.

"3. That on this record respondents' tariff provisions relating to free time and storage on cargo shipped over respondents' Philadelphia piers have not been shown to be otherwise unlawful."

There is a statement toward the end of the report in which the Board says: "We agree that quite apart from delays caused by customs and other governmental inspectors, the two-day period now allowed for the ingress pick-up, and egress of such number of trucks as are necessary to pick up or deliver the very substantial amounts of truck cargo passing over respondents' pier is, in view of the pier construction, the congestion, and the other conditions referred to, too short a time to be reasonable and proper under the circumstances. We believe the record indicates that a reasonable free time allowance on respondents' piers for all inbound and outbound truck cargo should be not less than five days as allowed for line haul rail cargo—and this is on the assumption that the calculation of time be continued in the manner now in force." This is perhaps less broad than the final conclusions set out in the 1-, 2-, 3- order quoted above. But even then it is a generalization which is a great deal wider than that which could be based on the facts specifically found. The parties concerned are entitled to have the reviewing tribunal have something more explicit than this type of generalization.

A more precise statement of the Board's explicit findings of fact and the reasons for its conclusion is the more required because of what we find done in Free Time and Demurrage Charges at New York, decided by the United States Maritime Commission, October 19, 1948.

In this New York case the issue was whether a five-day free period was long enough. The Commission approached the problem from the point of view that no cause of delay for which the water carrier was not responsible could be considered in deciding the reasonableness of free time. This would include customs, government inspection, and so on. There was a good deal of testimony in the instant case that a large part of Philadelphia's difficulties were caused by the delay in government inspection of huge shipments of wool which lay on the piers until the government inspectors found it convenient to do their work. On the issue of pier congestion the Commission in the New York case took the view that more free time would result in greater congestion. We find no explanation for the apparent difference in the point of view in that case from the views in this.[12]

11. 46 U.S.C.A. § 816.
12. In Girard Trust Co. v. United States, 1945, 149 F.2d 872, 873, this court remanded a judgment to the district court to make proper findings of fact and conclusions of law. The district judge had not

We have no desire to go over the report of the Board in the fashion of an instructor in English composition advising a high school student. On the other hand, if we are to do what we are required to do in the way of reviewing the action of an administrative agency, we must have some help in learning from that agency what is interesting discussion of the testimony of witnesses in a given case and what the agency concludes from that testimony. This report fails to give it and, therefore, will have to be sent back to the Board for appropriate findings of fact.

The order of the Board is vacated and the case returned to it for proceedings not inconsistent with this opinion.

made proper distinctions among the facts in issue but had lumped them together. Since distinctions "may be pertinent in deciding the case * * * under the applicable law", the findings were inadequate. If the appellate court disagrees

with the trial judge on some of the legal conclusions it is thus apparent that too general findings of fact make it impossible to discover whether there are sufficient facts to support the judgment on other principles of law.